KIRBY v LARSON

Docket No. 56211. Argued January 7, 1976 (Calendar No. 5).—Decided
July 18, 1977.

Kathryn A. and Robert J. Kirby and their daughter, Christine A.
Kirby, brought an action against Ellis L. Larson for damages
arising out of an automobile accident. Christine Kirby was a
passenger in a car owned by her mother and driven by Deborah
Cooper, who was making a left turn in an Ann Arbor intersec-
tion when the defendant's car crossed the intersection on a
yellow light and struck the Kirby car. The defendant contended
that Miss Kirby had urged Miss Cooper to make the turn when
she did. The jury was instructed on a theory of contributory
negligence that the verdict should be for the defendant if Miss
Kirby was negligent and if her own negligence proximately
contributed to her injuries. They were instructed that if they
found that the defendant or Miss Cooper had violated an Ann
Arbor traffic ordinance, the violation would be evidence of
negligence, but they were to disregard any evidence on the
issuance of a traffic summons to the parties. The Washtenaw

REFERENCES FOR POINTS IN HEADNOTES
[1] 20 Am Jur 2d, Courts §§ 82–86.
[2] 20 Am Jur 2d, Courts § 84.
[3] 29 Am Jur 2d, Evidence §§ 334, 981, 985.
  Conviction or acquittal as evidence of the facts on which it was
    based in civil action. 18 ALR2d 1287.
[4] 29 Am Jur 2d, Evidence §§ 334, 981, 985.
[5] 81 Am Jur 2d, Witnesses §§ 573, 583.
[6] 75 Am Jur 2d, Trial § 906 et seq.
[7] 75 Am Jur 2d, Trial § 906 et seq.
[8] 57 Am Jur 2d, Negligence §§ 131, 138, 163.
[9, 10] 75 Am Jur 2d, Trial § 628.
[11] 8 Am Jur 2d, Automobiles and Highway Traffic §§ 524, 528.
[12] 57 Am Jur 2d, Negligence § 426.
  The doctrine of comparative negligence and its relation to the
    doctrine of contributory negligence. 32 ALR3d 463.
[13] 57 Am Jur 2d, Negligence §§ 386–389.
[14] 5 Am Jur 2d, Appeal and Error § 545.
[15] 5 Am Jur 2d, Appeal and Error § 712.
[16] 5 Am Jur 2d, Appeal and Error §§ 728, 729.

Circuit Court, Edward D. Deake, J., gave a judgment on the jury's verdict for the defendant. The Court of Appeals, Quinn, P. J., and V. J. Brennan and Carland, JJ., affirmed in a memorandum opinion (Docket No. 17967). Plaintiffs appeal. *Held:*

1. Permitting the jury to begin deliberations before hearing counsel's objections to the instructions to the jury is erroneous because only if the procedure required by court rule is followed can the rights of all parties properly be protected and objections saved for appellate review. Moreover, it was not harmless error where the judge did not respond to the objections or correct his charge, which gives an appellate court no way of knowing if the objections were in fact fairly considered by the trial court.

2. At a number of points in his instructions to the jury, the trial court interchanged the words "a proximate cause" and "the proximate cause" of the injury. The correct instruction is *"a* proximate cause", because *"the* proximate cause" is tantamount to an instruction that a plaintiff cannot recover unless the defendant's negligence is the sole proximate cause of an injury, an interpretation which completely ignores the possibility that there may be two proximate causes of an actionable injury.

3. Where instructions to the jury give contradictory and conflicting rules which are unexplained and would or might lead to different results, the instructions as a whole are erroneous. The issue of proximate cause in this case was not only material, it was crucial. While some of the instructions given might have been interpreted to mean *"a* proximate cause", the jury might have thought otherwise. The jury demonstrated that it was confused by requesting further instructions on proximate cause but the erroneous instructions were not changed. Therefore the judgment is reversed and the cause remanded for a new trial.

Justice Williams, with Chief Justice Kavanagh and Justice Levin, wrote in addition:

1. The admissibility of a traffic summons in evidence as proof of negligence is a matter of practice and procedure; the court rule supersedes the statute to the extent practicable because no clear legislative policy reflecting considerations other than judicial dispatch of litigation can be identified. Issuance of a traffic summons is not admissible as substantive evidence of conduct at issue in a civil case arising out of the same occurrence. Although the credibility of a party in a civil case may be impeached by use of previous convictions of traffic violations,

municipal ordinance or misdemeanor convictions may not be used for impeachment purposes.

2. Although the driver's contributory negligence may not be attributed to a plaintiff passenger, the passenger may be contributorily negligent because of her own action or inaction. In this case the plaintiff passenger's urging the driver to turn and failure to warn the driver that the defendant's vehicle was bearing down on them may have been contributory negligence if the jury found that the passenger was able to control the driver by her urging.

3. The doctrine of contributory negligence is productive of substantial injustice in many cases such as this one, where the negligence of the plaintiff, if any, was arguably slight compared to the negligence of the defendant. Exceptions to it, such as the doctrine of last clear chance, have been devised to avoid its result in some cases. The doctrine was made by judges and may be abolished by judges when it has outgrown its usefulness. In the interest of justice the all-or-nothing doctrine of contributory negligence should be replaced by the "pure" form of comparative negligence (in which the loss is apportioned in proportion to the fault of the parties) as the rule of law because it is a more equitable approach to the problem of the negligent plaintiff and negligent defendant. As to the instant case and all cases filed after the date of this decision, where the negligence of the plaintiff is an issue, the amount of damages recovered by the plaintiff should be reduced in proportion to the extent of the plaintiff's fault. The doctrine of last clear chance served to mitigate the harshness of the contributory negligence rule and its retention therefore might appropriately be reconsidered once pure comparative negligence is adopted.

Justice Fitzgerald joined by Justices Ryan and Coleman, concurring in part with Justice Williams, agreed that the jury instructions were erroneous and confusing and that the trial court erred by ordering the jury to begin deliberating before counsel could object to the instructions. However, they said, this case is not an appropriate vehicle for adopting a theory of comparative negligence. The parties have not had an opportunity to brief or discuss the issue. They did not raise it in the Court of Appeals or the Supreme Court. At oral argument, both parties were reluctant to use this case to discuss comparative negligence. The Court should not inject into a case a theory which the parties are unwilling to discuss or have not had an opportunity to discuss. If the Court accepts the burden of altering a fundamental theory of tort law, it should do so in a carefully informed manner. It does not suffice to say that the

issue was briefed in a case which was argued May 6, 1971. Only two members of the present Court heard the argument. Although briefs on comparative negligence were requested in that case, the Court did not take a stand on whether it should be adopted. Comparative negligence is a complex and difficult doctrine. It should not be imposed without an opportunity for full discussion.

Justice Blair Moody, Jr., did not participate.

Reversed and remanded for a new trial.

OPINION BY WILLIAMS, J.

KAVANAGH, C. J., and LEVIN, J.

1. COURTS—CONSTITUTIONAL LAW—COURT RULES.

*The Supreme Court's rule-making power is constitutionally supreme in matters of practice and procedure (Const 1963, art 6, § 5).*

2. EVIDENCE—AUTOMOBILES—TRAFFIC SUMMONS—NEGLIGENCE.

*The admissibility of a traffic summons in evidence as proof of negligence is a matter of practice and procedure; the court rule governing it supersedes the statute to the extent practicable because no clear legislative policy reflecting considerations other than judicial dispatch of litigation can be identified (MCL 257.731; MSA 9.2431; GCR 1963, 607).*

3. EVIDENCE—SUBSTANTIVE EVIDENCE—CONVICTION OF A CRIME—ADMISSIBILITY.

*A criminal conviction after trial, or plea, or payment of a fine is not admissible as substantive evidence of conduct at issue in a civil case arising out of the same occurrence.*

4. EVIDENCE—AUTOMOBILES—TRAFFIC SUMMONS—ADMISSIBILITY.

*Issuance of a traffic summons is not admissible as substantive evidence of conduct at issue in a civil case arising out of the same occurrence (GCR 1963, 607).*

5. WITNESSES—CREDIBILITY—IMPEACHMENT—TRAFFIC VIOLATIONS.

*The credibility of a party in a civil case may be impeached by use of previous traffic violation convictions; however, municipal ordinance or misdemeanor convictions may not be used for impeachment purposes.*

6. TRIAL—INSTRUCTIONS TO JURY—OBJECTIONS.

Counsel must object to erroneous instructions to the jury before the jury retires to consider the verdict, which permits the judge

to correct or modify the properly questioned instructions before the jury retires; permitting the jury to begin deliberations before hearing counsel's objections is erroneous because only if the procedure required by the court rule is followed can the rights of all parties properly be protected and objections saved for appellate review (GCR 1963, 516.2).

7. TRIAL—INSTRUCTIONS TO JURY—OBJECTIONS.

Failure of a trial court to respond to timely objections of counsel to instructions to the jury or to correct the charge before the jury retires to consider the verdict was erroneous where the objections were clearly and well stated with supporting grounds because an appellate court has no way of knowing whether they were fully considered by the trial court (GCR 1963, 516.2).

8. NEGLIGENCE—PROXIMATE CAUSE—STANDARD JURY INSTRUCTIONS.

The correct instruction to a jury in an action for negligence is that the negligence must be *"a* proximate cause" of the injury rather than *"the* proximate cause" because there may be two proximate causes of an actionable injury (SJI 21.02).

9. TRIAL—INSTRUCTIONS TO JURY—CONFLICTING INSTRUCTIONS.

It is presumed when conflicting instructions which are unexplained are given to a jury that they may have followed the erroneous instructions; where following either of the conflicting instructions would or might lead to different results, the instructions are inherently defective and erroneous.

10. NEGLIGENCE—INSTRUCTIONS TO JURY—PROXIMATE CAUSE.

Confusing and erroneous jury instructions in a trial for negligence amounted to reversible error where the trial court at a number of points in the instructions interchanged the words "a" and "the" when referring to the question of proximate cause, the issue of proximate cause was not only material, it was crucial, and the jury demonstrated its confusion by requesting further instructions on the issue during its deliberation (SJI 21.02).

11. NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—AUTOMOBILES—DRIVER —PASSENGER.

*The contributory negligence of the driver of an automobile may not be attributed to a plaintiff passenger, but the passenger may be contributorily negligent because of his own action or inaction, for example by importunities to the driver which increase the danger or by failure to warn the driver, provided that the plaintiff passenger is able to control the driver.*

12. Negligence—Contributory Negligence—Comparative Negligence.

   *The all-or-nothing doctrine of contributory negligence is abolished and replaced by the pure form of comparative negligence as the rule of law in the interest of justice because it is a more equitable approach to the problem of the negligent plaintiff and negligent defendant.*

13. Negligence—Last Clear Chance—Contributory Negligence—Comparative Negligence.

   *The doctrine of last clear chance serves to mitigate the harshness of the contributory negligence rule and its retention might appropriately be reconsidered once pure comparative negligence is adopted.*

Opinion by Fitzgerald, J.

Coleman and Ryan, JJ.

See headnotes 6–10.

14. Negligence—Comparative Negligence—Rule of Law—Appeal and Error.

   *An action for negligence is not an appropriate vehicle for adopting a theory of comparative negligence where the parties have not had an opportunity to brief or discuss the issue, did not raise it in the Court of Appeals or the Supreme Court, and at oral argument were reluctant to discuss it.*

15. Appeal and Error—Theory of the Case.

   *The Supreme Court should not inject into a case a theory which the parties are unwilling to discuss or have not had an opportunity to discuss.*

16. Appeal and Error—Torts—Rule of Law.

   *The Supreme Court, if it accepts the burden of altering a fundamental theory of tort law, should do so in a carefully informed manner; it does not suffice to say that the issue was briefed and argued six years before the instant case in a case which did not decide whether the theory should be adopted where only two members of the present Court heard the argument.*

*Newman & Mackay* for plaintiff.

*Willingham, Coté, Hanslovsky, Griffith & Foresman, P. C.,* for defendant.

WILLIAMS, J. This case involves an automobile accident in which the negligence, if any, of plaintiff was arguably slight compared with that of defendant. Despite this small dereliction, however, the all-or-nothing doctrine of contributory negligence was applied below, and plaintiff was denied any recovery.

This unfortunate result raises once again, as in *Vanderah v Olah,* 387 Mich 643; 199 NW2d 449 (1972), the question of whether a more equitable approach to the problem of the negligent plaintiff and the negligent defendant might be in the apportionment of damages commensurate with the degree of fault. This concept underlies the doctrine of comparative negligence, and, in the interest of justice, it is the doctrine we adopt today.

We would hold therefore that the doctrine of contributory negligence is replaced in this jurisdiction by comparative negligence, and will be applied to all cases filed after the date of this opinion.

As to the case before us, we find that remand to the circuit court for retrial is necessary because of confusing and erroneous jury instructions on the question of proximate cause. Therefore, if the matter arises, comparative negligence shall be applied to this case at retrial.

## I—FACTS

An automobile accident at the intersection of Hill and Main Streets in Ann Arbor on August 16, 1971 precipitated this negligence action.

Plaintiff Christine Kirby, then a high-school student, was a passenger in a small MG automobile owned by her mother and driven by her friend Deborah Cooper. The MG proceeded south on Main and stopped under an overhead traffic light at the intersection of Hill and Main. The light was green

at the time, and Cooper was signaling for a left turn.

A two-ton Buick driven by defendant Ellis Larson proceeded north on Main Street in the inside lane. Another vehicle, in which witness Robert Wright was a passenger, was traveling in the curbside lane in the same direction as Larson. Wright testified that his car stopped at the intersection because the traffic signal was turning amber.

Cooper and Kirby saw the Wright vehicle stop. They both saw defendant's car about three or four lengths back from the intersection and anticipated that it, too, would stop. Cooper began to complete her left turn. Defendant's vehicle, however, traveling at 25–30 miles per hour, went past Wright's stopped car, and proceeded into the intersection at the same time as the Cooper vehicle was going through it.

The Buick struck the MG in the right rear, causing the car to spin around 180 degrees. Christine Kirby was flung over the hood of the car, landing on her face and suffering a back sprain, dislocated knees, severe facial lacerations and the loss of four front teeth with the possibility of loss of other teeth in the future.

Cooper testified she was halfway through the intersection when she was struck.

Defendant testified that he did not see the light change from green to any other color, and that he did not observe any movement on the part of the MG until he approached the intersection. He did say, however, that the light had turned yellow before he got to the white line at the intersection.

Although the police officer at the scene testified he could not identify skid marks from defendant's vehicle, defendant testified he did point out the

marks indicating he had tried to stop. He also said he told the police officers the accident was not his fault because he felt he could have made it through the yellow light. However, a summons was issued to defendant for violation of the caution signal, pursuant to Ann Arbor ordinances, § 10.26. No summons was issued to Cooper.

The court held that evidence of the traffic summons was inadmissible. It did, however, permit evidence of past traffic convictions to reach the jury, but after receiving this favorable ruling, defense counsel never presented testimony on this issue.

Defendant contended that plaintiff Kirby had urged Cooper to make the turn when she did.[1] Plaintiff presented two apparently different versions of what actually happened. At trial, she insisted that she said nothing until *after* Cooper was already cranking the wheel to turn. Her testimony at the deposition, however, was that she told Cooper to turn *before* the turn had begun. She felt

---

[1] On direct examination, Kirby testified:

"*A. [Kirby]:* Debbie was cranking the wheel and being I'm a very nervous passenger in any case I said something, 'Well, Debbie you better start turning.' I don't really know the exact words but I did say something about the truck's moving and we were right in the intersection so I was really kind of scared.

"*Q.* Was she in the process of turning at that time?

"*A.* Oh, yes."

However, on cross-examination, her contradictory deposition came out.

"*Q.* That she had started her turn before you said anything is that my understanding of your testimony here?

"*A. [Kirby]:* Ya.

"*Q.* Do you recall when your deposition was taken on April 5th of 1972, being asked this series of questions and these answers? On page 18 the lower portion. '*Q. (Mr. Coté:* In any event, Debbie didn't attempt to make a left turn until after you stated to her that she should turn left to clear the intersection I take it?'

\* \* \*

"*Q.* And your answer under oath on that date was, 'Yes.' \* \* \* "

there was no contradiction, because she said she urged her friend to turn because it was a crowded intersection, they were blocking traffic and she saw defendant was not stopping.

Relevant to the issues before this Court, the jury was instructed that the verdict should be for the plaintiff if she was injured, if defendant was negligent, and if such negligence was the proximate cause of her injuries, unless plaintiff herself was negligent and such negligence proximately contributed to her injuries. They were instructed that if they found that defendant violated an Ann Arbor ordinance regulating vehicular traffic, such violation would be evidence of negligence.[2] The jury was also instructed on the same standard of care should they find that plaintiff violated a traffic ordinance.[3]

The jury was instructed to disregard anything

---

[2] The judge instructed:

"If you find that the defendant violated this ordinance before or at the time of the occurrence such violation is evidence of negligence which you should consider together with all the other evidence in deciding whether the defendant was negligent. If you find that the defendant was negligent, you must then decide whether such negligence was the proximate cause of the injury to the plaintiff.

"If you find no negligence by the defendant or that any negligence was not a proximate cause of the injuries to the plaintiff, then you must find for the defendant."

[3] "The City of Ann Arbor has an ordinance which provides that: '10.20. Duties on Turning. The driver of any vehicle upon a street before starting, stopping or turning from a direct line shall first see that such movement can be made in safety, shall give a signal as required by this section, and shall yield the right of way to vehicles coming in the opposite direction or approaching from the rear.'

"If you find that the operator of the plaintiff vehicle violated this ordinance before or at the time of the occurrence such violation is evidence of negligence which you should consider together with all other evidence in deciding whether the defendant was at all negligent.

"If you find that the operator of the plaintiff vehicle was negligent you must then decide whether such negligence was the sole proximate cause of the accident. If it was, and if you find no negligence by the defendant which was a proximate cause of the accident then your verdict would be for the defendant."

relative to the issuance of a traffic summons or ticket, and was instructed as follows on the possibility of plaintiff's contributory negligence:

"I further instruct you the jury while any negligence by the operator of the plaintiff vehicle, Debra *[sic]* Cooper is not to be imputed to her passenger, the plaintiff, Christine Kirby even though a passenger can be guilty of negligence in her own right in the operation of the vehicle in which she is riding; and if you find that Debra *[sic]* Cooper acted solely or primarily on the basis of what the passenger Christine Kirby said and that passenger Christine Kirby was aware or should have been aware of the existing dangerous situation then if you find that Christine Kirby was personally and contributorily negligent and such negligence was a proximate cause of the injury and damages alleged by her and in that event Christine Kirby cannot recover from the defendant and your verdict therefore would be for the defendant."

Following completion of the instructions, and prior to giving counsel an opportunity to state objections to the instructions, the jury was ordered to begin deliberations.

Plaintiff's counsel objected to that procedure, and to the injection of contributory negligence into the case, claiming that the negligence of the driver could not be imputed to a passenger. Further, he argued, his client could not be negligent on her own because she had no right of control of the automobile and she did not interfere with the driver in any way.

He also objected to the court's instructing that the jury was to determine whether the negligence of the defendant was *the* proximate cause of plaintiff's injuries. The proper statement of law, he maintained, was that defendant's negligence must be *a* proximate cause.

He also objected to the instruction ordering the jury not to consider the issuance of a traffic ticket, . noting that defendant brought that out himself on direct.[4]

All objections were denied.

After the jury began deliberating, they asked the court for additional help:

> "*The Court:* This is a continuation of Chris Kirby against Larson. I have two requested questions from the jury. One, if the driver of plaintiff's car was proximate[5] cause of the accident, but defendant was also negligent, would jury be required to find for the defendant?
>
> "I can't answer that question. There are answers in the instructions I have given you. On the city ordinances and state law, I have given them twice so you have to do the best you can on the instructions that I have given you."

The jury also asked for a definition of "preponderance, that is when one side greatly outweighs the other".

The jury found for defendant. The Court of Appeals affirmed, in a brief memorandum opinion citing the "harmless error rule", GCR 1963, 529.1.[6] We granted leave to appeal December 23, 1974. 393 Mich 772 (1974).

## II—ADMISSIBILITY OF EVIDENCE OF A TRAFFIC TICKET

The trial court refused to admit, over objection

---

[4] Defense counsel argued that defendant's remark about the traffic ticket was an unresponsive comment and was not properly before the court.

[5] Page 286 of the transcript is missing an article before the word "proximate," so that we do not know whether the jury was asking about *a* proximate cause or *the* proximate cause.

[6] The nature of the error was not, however, revealed by the Court.

by plaintiffs, evidence of and closing argument about issuance of a traffic summons by the officer on the scene to defendant for disregarding a caution signal. The trial judge also excluded evidence of the bench trial conviction on the ticket because it "would not be material to this case". However, citing *Sting v Davis,* 384 Mich 608; 185 NW2d 360 (1971), the judge permitted cross-examination on other traffic convictions.

MCLA 257.731; MSA 9.2431 requires:

"No evidence of the conviction of any person for any violation of this chapter or of a local ordinance pertaining to the use of motor vehicles shall be admissible in any court in any civil action."

GCR 1963, 607, however, provides:

"During the trial of civil actions the rules of evidence approved in *Van Goosen v Barlum,* 214 Mich 595 [183 NW 8 (1921)]; *Zimmerman v Goldberg,* 277 Mich 134 [268 NW 837 (1936)]; *Socony Vacuum Oil Co v Marvin,* 313 Mich 528 [21 NW2d 841 (1946)]; *Cebulak v Lewis,* 320 Mich 710 [32 NW2d 21 (1948)], and re-enacted by PA 1961, No. 236, § 600.2158, shall prevail, anything in section 731 of the Michigan vehicle code (CLS 1961, § 257.731) to the contrary notwithstanding."

*Zimmerman v Goldberg* permitted defendant's guilty plea to be used as substantive evidence in a subsequent negligence trial based on the same accident. *Socony Vacuum Oil Co v Marvin* and *Cebulak v Lewis* permitted evidence of payment of a fine for the same purpose. Thus, GCR 1963, 607 in effect contradicts MCLA 257.731; MSA 9.2431. *Van Goosen v Barlum* permitted interrogation concerning arrests and convictions on matters not arising from the facts of the instant negligence case.

Our Court's rule-making power is constitutionally supreme in matters of practice and procedure, Const 1963, art 6, § 5. Thus, since admissibility of a traffic ticket is an evidentiary question, the court rule supersedes the statute. As suggested in 3 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), p 404, "Because no clear legislative policy reflecting considerations other than judicial dispatch of litigation can be identified,[7] section 731 should be construed simply as a statutory rule of practice, validly superseded by Rule 607 to the extent applicable."

However, following adoption of GCR 1963, 607, we decided *Wheelock v Eyl,* 393 Mich 74, 78–79; 223 NW2d 276 (1974)[8]. In that case we reasoned that because civil and criminal cases involve different considerations and satisfy different policies, even if the same conduct is involved,

"a criminal conviction after trial, or plea, or payment of a fine is not admissible as substantive evidence of conduct at issue in a civil case arising out of the same occurrence."

*Wheelock,* however, did not involve the question of whether issuance, as opposed to conviction, of a traffic ticket could be considered.[9] *Bolser v Davis,*

---

[7] Honigman & Hawkins suggest that two possible policies underlie the rule, one that such convictions are not credible evidence or are unduly prejudicial, and the other that the policy is to encourage guilty pleas in traffic courts. However, since, as drafted, the statute relates only to the admissibility of evidence, a subject clearly more within the rule-making competence of the courts, the rule should supersede the statute where the two conflict. 3 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), p 404.

[8] Justices FITZGERALD and WILLIAMS dissented stating: "This case is governed by *Socony Vacuum.*"

[9] In *Wheelock,* the majority of the Court agreed with defendant's [Eyl's] contention that his payment of a traffic ticket fine could not be considered as evidence of negligence. We did not consider whether the trial court correctly ruled that *issuance* of the traffic ticket could be

62 Mich App 731, 733; 233 NW2d 845 (1975). That issue was considered in *Ilins v Burns,* 388 Mich 504; 201 NW2d 624 (1972).

In *Ilins,* defendant responded to her counsel's questions and told the court no traffic ticket was issued. Plaintiff counsel's motion for a mistrial was denied. Defense counsel asked the police officer the same question, but the officer did not answer. Neither party, under instructions from the court, mentioned the subject in argument, and the court cautioned the jury not to consider the matter in their deliberations.

Nevertheless, we found prejudicial error because "[t]he question of the issuance of a traffic ticket was indelibly registered on the minds of the jurors". 388 Mich 511–512.[10]

"In this case, the questioning of defendant and of the police officer with regard to the issuance or nonissuance of a ticket, of necessity, went to the judgment of the police officer and inescapably placed before the jury, by inference, the opinion of the police officer as to who was responsible for the accident. Once it was shown that defendant did not receive a ticket, the opinion of the police officer assessing her responsibility for the accident would be before the jury as clearly as if he had stated such opinion in so many words." 388 Mich 510.

Thus, the rule today is that evidence of the *issuance* of a ticket may not be admitted. We do not, however, address ourselves to the conclusion in *Dudek v Popp,* 373 Mich 300, 308–309; 129

substantive evidence of negligence. Since the basis of the decisions overruled by *Wheelock* was the prior judicial admission exception to the hearsay rule, 393 Mich 78, the traffic ticket issuance question, involving as it does other problems, was not resolved.

[10] It is likely that we were influenced by defense counsel's deliberately injecting the traffic ticket information into the case. 388 Mich 511. Compare *Gibson v Traver,* 328 Mich 698, 701–702; 44 NW2d 834 (1950); *Moffatt v Helmer,* 345 Mich 153, 157–158; 75 NW2d 887 (1956).

NW2d 393 (1964), where, because the police officer testified as an expert on the cause of the accident, traffic ticket evidence was admissible in order to indicate the basis of the officer's expert opinion.

Since *Wheelock* and *Ilins* involved matters of substantive evidence, this leaves us with the question of whether an individual in a civil case may be impeached with evidence of other traffic convictions. GCR 1963, 607 permits this, by reference to *Van Goosen v Barlum,* 214 Mich 595, 599; 183 NW 8 (1921), in which we held it appropriate to attempt to impeach defendant's credibility by use of previous driving convictions. See also MCLA 600.2158; MSA 27A.2158;[11] *Sting v Davis,* 384 Mich 608; 185 NW2d 360 (1971).

In *People v Renno,* 392 Mich 45, 55; 219 NW2d 422 (1974), this Court held that municipal ordinance or misdemeanor convictions may not be used for impeachment purposes.

The proposed Michigan Rules of Evidence would provide that the credibility of a witness may not be impeached by evidence that he was convicted of a crime punishable by imprisonment for one year or less unless the crime involved dishonesty or false statement. MRE 609(a)(2). This rule would modify *Renno, Sting,* and GCR 1963, 607. It appears that before this case is likely to be retried this Court will act comprehensively regarding the proposed Michigan Rules of Evidence.

### III—The Proximate Cause Instruction

The trial court gave varying instructions to the

---

[11] "No person shall be excluded from giving evidence on any matter, civil or criminal, by reason of crime or for any interest of such person in the matter, suit, or proceeding in question, or in the event of such matter, suit or proceeding, in which such testimony may be offered, or by reason of marital or other relationship to any party thereto; but such interest, relationship, or conviction of crime, *may be shown for the purpose of drawing in question the credibility of such witness,* except as is hereinafter provided." (Emphasis added.)

jury concerning the effect of violation of an Ann
Arbor traffic ordinance.

Thus, at one point, the jury was instructed
concerning violation of one ordinance:[12]

"If you find that the defendant was negligent you
must then decide that such negligence was *the proxi-
mate cause* of the injury to the plaintiff." (Emphasis
added.)

Concerning another ordinance,[13] the instruction
was:

"If you find that the defendant was negligent, you
must then decide whether such negligence was *the
proximate cause* of the injury to the plaintiff.

"If you find no negligence by the defendant or that
any negligence was not *a proximate cause* of the inju-
ries to the plaintiff, then you must find for the defend-
ant." (Emphasis added.)

Still another instruction[14] was:

"If you find the defendant was negligent you must
then decide whether such negligence was *a proximate
cause* of the injury to the plaintiff.

"If you find no negligence by the defendant, or that
any negligence was not *the proximate cause* of the
injuries to the plaintiff, then you must find for the
defendant." (Emphasis added.)

---

[12] This was Ann Arbor ordinances, § 10.26(3), concerning effect of a
red signal light at an intersection.

[13] This was Ann Arbor ordinances, § 10.37, concerning the right of
way while making a left turn.

[14] This involved Ann Arbor ordinances, § 10.26(2), the effect of a
yellow caution light.

A different instruction appeared in the charge on the ordinance concerning duties on turning.[15]

"If you find that the operator of the plaintiff vehicle was negligent you must then decide whether such negligence was *the sole proximate cause* of the accident. If it was, and if you find no negligence by the defendant which was *a proximate cause* of the accident then your verdict would be for the defendant." (Emphasis added.)

As for the effect of the violation of still another ordinance,[16] the judge instructed:

"If you find that the defendant was negligent you must then decide whether such negligence was *a proximate cause* of the injury to the plaintiff. If you find no negligence by the defendant or that any negligence was not *the proximate cause* of the injuries to the plaintiff then you must find for the defendant." (Emphasis added.)

The same type of mixture of instructing on *"the* proximate cause" and *"a* proximate cause" occurred in other parts of the court's instructions. Thus, when explaining the role of contributory negligence, the jury was told such negligence must be *"a proximate cause",* and that defendant had the burden of proof to show that plaintiff's negligence was *"a proximate contributing cause",* but that the verdict would be for plaintiff if defendant's negligence was *"the proximate cause".*

The jury was instructed that their verdict would be for the defendant if defendant's negligence was not *"a proximate contributing cause"* of the injuries. (Emphasis added in all above quotations.)

At the conclusion of the instructions, the court

---

[15] This is Ann Arbor ordinances, § 10.20.

[16] This was Ann Arbor ordinances, § 10.44, which requires drivers to maintain a careful and prudent speed.

asked if the parties were satisfied, but then pro-
ceeded to have the jury begin deliberations before
the attorneys made their objections. Plaintiff's
counsel objected to that procedure, and, objected as
well to the use of the term *"the* proximate cause"
instead of *"a* proximate cause". Defense counsel
had no objections. The plaintiff's protests to the
jury deliberating before objections and to the prox-
imate cause instruction were not directly re-
sponded to, but other objections were overruled.[17]

After they began meeting, the jury appeared
confused and requested further instructions. Clari-
fication was requested "as to the ordinance of law
pertaining to the driver's negligence that would be
plaintiff's car *[sic]* how that would affect the case;
the city ordinance in regard to a left turn".

In response, the judge repeated the instructions
given previously concerning the ordinances, in-
cluding the differing standards of "a" and "the"
proximate cause. Plaintiff's counsel repeated his
objections. Once again, the court did not directly
respond to this point.

The jury requested further help. According to
the judge, one of the questions was "if the driver
of plaintiff's car was[18] proximate cause of the
accident, but defendant was also negligent, would
jury be required to find for the defendant?"

The judge replied:

"I can't answer that question. There are answers in
the instructions I have given you. On the city ordi-
nances and state law, I have given them twice so you

---

[17] These included a claim that contributory negligence was improp-
erly inserted into the case.

[18] Unfortunately, the transcript is missing the article at this crucial
point, so that we do not know, in fact, whether the jury referred to
"a" or "the" proximate cause, or perhaps in confusion intentionally
dropped the article altogether.

have to do the best you can on the instructions that I have given you."

Error was committed in this portion of the trial.

GCR 1963, 516.2 requires that counsel object to instructions "before the jury retires to consider the verdict". The usual thrust of the rule is to require timely objections by counsel. However, the procedure is also designed to permit the judge, upon being presented with an error properly specified with supporting grounds, to correct or modify the questioned instructions before the jury retires. See discussion, 2 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), Rule 516, pp 564–567. Thus, each party's right to have the theory of the case explained to the jury in an orderly manner, with equal weight to the theory of each party, is carried out. *Id,* p 562. "Only if such procedure is followed by court and counsel can the rights of all parties properly be protected and objections to erroneous jury instructions assuredly be saved for appellate review." *Hunt v Deming,* 375 Mich 581, 585; 134 NW2d 662 (1965).

Thus, the judge in the case at bar erred when he permitted the jury to begin deliberations prior to hearing counsel's objections. Moreover, this was not harmless error, since for whatever reason, the judge erred in neither responding to the objections nor correcting his charge. Therefore, while this is not a case where counsel was not given an opportunity to state objections on the record, *Herndon v Woodmen of the World Life Insurance Society,* 1 Mich App 141, 144; 134 NW2d 825 (1965); *Wells v Prudential Insurance Co of America,* 3 Mich App 220, 229; 142 NW2d 57 (1966), and the objections were clearly and well stated for the benefit, no doubt, of a reviewing court, they were not responded to by the trial court. Thus, we have no

way of knowing whether they were in fact fairly considered by that court. Further, improper instructions pertaining to a vital issue in the case were in fact given.

It is clear that within the context of this case, the issue of proximate cause was crucial. The jury apparently thought so, and apparently was sufficiently confused or concerned about the concept that it asked for additional help twice.

Both the Standard Jury Instructions[19] and our case law make it clear that the correct instruction is "a proximate cause". We have specifically disapproved instructing that defendant's negligence must be *the* proximate cause, because such a charge is tantamount to an instruction that plaintiff cannot recover unless defendant's negligence is the sole proximate cause of an accident, an interpretation completely ignoring the possibility that there may be two proximate causes. *Sedorchuk v Weeder,* 311 Mich 6, 10–11; 18 NW2d 397 (1945); *Barringer v Arnold,* 358 Mich 594, 599–600; 101 NW2d 365 (1960).

Unquestionably, the instructions concerning *the*

---

[19] *See, e.g.,* SJI 21.02:

"The plaintiff has the burden of proof on each of the following propositions:

\* \* \*

"(c) that the negligence of the defendant was *a* proximate cause of the (injuries) (damages) to the plaintiff.

"The defendant has the burden of proof on his claim that the plaintiff was negligent in one or more of the ways claimed by the defendant as stated to you in these instructions; and that such negligence was *a* proximate contributing cause of the (injuries) (damages) to the plaintiff.

\* \* \*

"Your verdict will be for the defendant, if plaintiff was not (injured) (damaged); or if defendant was not negligent; or if negligent, such negligence was not *a* proximate cause of the (injuries) (damages); or if the plaintiff himself was negligent and such negligence was *a* proximate contributing cause of his (injuries) (damages)." (Emphasis added.)

proximate cause were erroneous. It is equally true that the instructions concerning *a* proximate cause were correct. We, of course, review instructions as a whole in order to ascertain their adequacy. *Shreve v Leavitt,* 51 Mich App 235, 240–241; 214 NW2d 739 (1974).

We find that, given the facts in this case, the correct disposition was that set forth in *Iwrey v Fowler,* 367 Mich 311, 314–316; 116 NW2d 722 (1962):

"The effect of inconsistent or contradictory statements, relating to a material issue, in instructions to the jury by the trial judge has been considered in a number of decisions of this Court. In *In re Bailey's Estate,* 186 Mich 677, 690 [153 NW 39 (1915)], the trial judge, as it was claimed, made conflicting statements to the jury in a will contest with reference to the burden of proof relating to undue influence. In reversing the case and granting a new trial, it was said:

" 'When conflicting charges are given, one of which is erroneous, it is to be presumed that the jury may have followed that which was erroneous. *Grand Rapids & I R Co v Monroe,* 47 Mich 152, 154 [1881]; *Madill v Currie,* 168 Mich 546, 560 [134 NW 1004 (1912)].'

\* \* \*

" \* \* \* In *Pettersch v Grand Rapids Gas Light Co,* 245 Mich 277, 281 (28 NCCA 44) [222 NW 123 (1928)], this Court quoted with approval the general rule on the subject of contradictory instructions as stated in 14 RCL, Instructions, § 45, pp 777, 778:

" ' "Where instructions give to the jury contradictory and conflicting rules for their guidance, which are unexplained, and following either of which would or might lead to different results, then the instructions are inherently defective and erroneous. And that is true though one of the instructions correctly states the law as applicable to the facts of the case. The reason for this is that where the instructions on a material point

are contradictory, it is impossible for the jury to decide which should prevail, and it is equally impossible, after the verdict, to know that the jury was not influenced by that instruction which was erroneous, as the one or the other must necessarily be where the two are repugnant. A further reason is that conflicting and contradictory instructions in effect leave the jury without instructions to guide them with reference to the law arising upon the evidence in the cause."

" 'See, also, *Herzberg v Knight,* 289 Mich 29 [286 NW 145 (1939)]; *Socony Vacuum Oil Co v Marvin,* 313 Mich 528 [21 NW2d 841 (1946)]. It cannot be said in the instant case that the jury did not follow the erroneous instructions. It must be held, in consequence, that the giving of such instructions constituted prejudicial error.'

"We think that the rule applied in the decisions above cited must be applied in the case at bar. It cannot be affirmatively said that the jury could not have been misled to the prejudice of plaintiffs by the language above quoted from the charge. It follows that the judgments entered must be reversed and new trials granted to the appellants."

There is no question but that the issue of proximate cause was not only material, it was crucial and critical. The jury further demonstrated it was confused, but the apparently troublesome instructions were not changed. While it is true that the instructions might have been interpreted to mean *a* proximate cause, it is also equally true that the jury might have contemplated otherwise. In the presence of the unprovable we cannot surmise. We must reverse. See, *e.g., Klenke v Russell,* 9 Mich App 409, 415; 157 NW2d 428 (1968); *Shreve v Leavitt,* 51 Mich App 235, 240; 214 NW2d 739 (1974) ("At a number of * * * points in his instructions to the jury, the trial court * * * interchanged the words 'a' and 'the' when referring to the question of proximate cause".). Therefore, a new trial must be ordered.

### IV—IMPUTED NEGLIGENCE—OR CONTRIBUTORY NEGLIGENCE?

Plaintiff's counsel consistently argued that his client was not contributorily negligent and that the court was improperly imputing the negligence of the driver of the car, *i.e.* Deborah Cooper, to Christine Kirby. In *Bricker v Green,* 313 Mich 218, 236; 21 NW2d 105 (1946), we overturned the rule of imputed negligence first announced in *Lake Shore & M S R Co v Miller,* 25 Mich 274 (1872):

"solely on the ground that the injured person was a voluntary, gratuitous passenger in an automobile, the driver of which was guilty of negligence which was a contributing proximate cause of an accident and injury to such passenger.

"Our holding herein should not be construed as excluding under appropriate circumstances the defense of contributory negligence on the part of the passenger, if relative to the cause of the accident the passenger failed to exercise such reasonable care and caution as he should have exercised under the circumstances." 313 Mich 235.

Thus, while the driver's contributory negligence may not be attributed to plaintiff passenger, the passenger may be contributorily negligent because of her own action or inaction. See *Vanderah v Olah,* 387 Mich 643; 199 NW2d 449 (1972) (passenger knowingly entrusted herself to a drunk driver). The question of plaintiff's contributory negligence is, of course, one of fact. *Mitchell v DeVitt,* 313 Mich 428, 431; 21 NW2d 111 (1946). Thus, the failure to warn of a danger of which passenger knows and of which he or she has every reason to believe driver is unaware may be contributory negligence. 2 Restatement, Torts 2d, § 315, p 123. This requires, however, that the driver be negli-

gent, that this negligence be a legally contributing cause of the harm, that the plaintiff-passenger be able to control the driver,[20] and that exceptional circumstances exist which require the passenger to keep a lookout.[21] The Restatement also notes that in ascertaining the duty to warn, "allowance must be made for the possibility that by interfering the plaintiff will increase rather than diminish the danger". 2 Restatement, Torts 2d, § 495, p 557.

Plaintiff's only action which could be construed as contributory negligence was her urging the driver to turn. See Notice of Affirmative Defense. If a failure to warn can be construed as negligence, is the same true of the converse? Can warning a driver be construed as negligence? The question, then, becomes in this case, did the fact of plaintiff's telling the driver to turn amount to contributory negligence?

We agree with defendant that the issue so framed is not one of imputed negligence. There may not only be in specific circumstances a duty to warn, there may as well be instances where a warning may itself create danger. As we said in *Sherman v Korff,* 353 Mich 387, 395; 91 NW2d 485 (1958):

"[W]hat control or right of control has a passenger, even though he may be a co-owner, as the car speeds down the highway, driven by the other co-owner? Any attempted exercise of the right of control by wrestling the wheel from the driver would be foolhardy. Equally

[20] For example, it should be apparent that the driver would heed the warning.

[21] The Restatement suggests that exceptional situations exist where "plaintiff knows that at a particular point there will be a peculiar danger, which he has no reason to believe that the driver if unaided will perceive", or, for example, if "he knows from past experience, or from the manner in which the car is being driven on the particular trip, that the driver is likely to be inattentive or careless". 2 Restatement, Torts 2d, § 495, pp 556–557.

menacing to the driver's efficient operation of the machine are raucous reproaches, strident denunciations, or even persistent unctuous admonitions from the back seat. 'Generally,' it was well put in a Federal case, 'it is the duty of the passenger to sit still and say nothing. It is his duty, because any other course is fraught with danger. Interference, by laying hold of an operating lever, or by exclamation, or even by direction or inquiry, is generally to be depreciated; in the long run, the greater safety lies in letting the driver alone.' *Southern Pacific Co v Wright,* 248 F 261, 264 [CA 9, 1918]."

The case at bar is not the typical "back seat driver" situation where the passenger clearly interferes with the safe functioning of the automobile. It is a closer question than that, and originally, plaintiff might have been negligent if she had failed to warn the driver to complete her turn as she observed the other vehicle bearing down on them. Arguably, too, plaintiff's importunities had no effect on the driver, and she did what she was going to do in the first place anyway. But no one asked her that.

In any event, we are not going to second-guess the jury on the question of contributory negligence, for this conclusion, while arguable, is supportable by the record. Further, since this cause is to be retried, it is possible that a better record will be developed in which the driver's actions and motivations will be clarified.

## V—Comparative Negligence as an Issue in This Case

This case raises still another issue, one of substantial import to our jurisprudence. Because we are remanding for retrial, and because the issue may well arise then, in the interest of judicial economy, we should consider it at this juncture.

The negligence of plaintiff in this case was apparently so slight, there was even a question whether she was indeed negligent at all. However, she having been adjudged negligent, the doctrine of contributory negligence was triggered, and plaintiff thereby recovered nothing, however deserving she might otherwise have been, and however greater the negligence of defendant might have been.

Thus, the facts of this case directly raise the issue to which we said, in *Vanderah v Olah,* 387 Mich 643, 654; 199 NW2d 449 (1972) (opinion of WILLIAMS, J.), we would return. Because this case constitutes a sufficient instance where the application of contributory negligence causes such substantial injustice, we must invoke the notice we gave in *Vanderah* "to remand a similar future case under a doctrine of comparative negligence" (italics removed).[22]

---

[22] In *Vanderah,* where plaintiff's negligence consisted in knowingly associating herself with a drunk driver, this writer observed, 387 Mich 659-661:

"While I feel bound for the present by the recognition of this 'contributory negligence' doctrine by our case law and by the Restatement, I recognize the blunderbuss, all or nothing, character of the doctrine.

\* \* \*

"The effect of this rule then is on the one hand to relieve from any liability, because of the 'negligence' of the passenger, a third party driver who, despite the lesser or greater degree of his negligence, is nonetheless an affirmatively negligent driver without whom the accident would not have happened and, on the other hand, to possibly separate from any recovery one whose cause of injury is the direct result of the negligence of others and her 'negligence' though real is only in associating herself with a negligent actor. A more equitable and rational balancing of the interests to be served by the law of tort would allow the jury to balance the foolishness of the plaintiff guest against the negligence of her host and the negligence of the other driver, and to return a verdict expressed in terms of a percentage of the plaintiff's damage attributable to the defendant third party driver's negligence.

\* \* \*

"In short it appears that, while there is logic in our Michigan law

It is true that plaintiff argued that she was not negligent in this case, and by so doing was foreclosed from arguing comparative negligence. However, under the doctrine of contributory negligence as it applied at the time of trial, she had no other choice. To announce she was contributorily negligent would have been tantamount to announcing she acknowledged she could not recover.

Clearly, a trial court was not the place to introduce the doctrine of comparative negligence to the jurisprudence of our state, nor was the Court of Appeals. This is a matter which is clearly within the competence of this Court only. Therefore, we will not penalize plaintiff for not indulging in exercises in futility and for not possessing sufficient prescience to know we would consider applying the doctrine of comparative negligence to this case.

Plaintiff, further, although strictly denying any contributory negligence as defined in *Vanderah,* indicated that if there were any such negligence "Justice WILLIAMS also gave notice that he would invoke the doctrine of comparative negligence in cases of a like kind in the future". (Plaintiffs' Brief, p 34.)

Further, we have already had the benefit of extensive legal argument on the issue of comparative negligence in the case of *Parsonson v Construction Equipment Co,* 386 Mich 61, 79 *et seq.;* 191 NW2d 465 (1971). There we did not reach the

of negligence which renders real justice in most cases, it is so rough hewn that in a number of cases its all or nothing rule gives either too much or too little. It is for this reason that a comparative negligence system appears necessary to render a more even level of justice. The character and stage of this case render it an inappropriate instrument to launch such a doctrine, but, absent clear evidence of the legislature filling this gap in our present system, when an appropriate case opportunely appears an opinion supporting a rule of comparative negligence will be forthcoming."

issue because we found that plaintiff's theory of defendant's negligence was at best conjecture. Such is not the case here, and we will therefore proceed with our consideration of the legal issue.

## VI—CONTRIBUTORY NEGLIGENCE IN MICHIGAN

The beginning of contributory negligence is generally attributed to *Butterfield v Forrester,* 11 East 60; 103 Eng Rep 926 (1809). In that case, defendant had put a pole across a highway and plaintiff, "riding violently" as he left a tavern in the early evening, was injured when his horse fell over the pole. He might not have been so injured had he been riding more carefully. As expressed by Lord Ellenborough, the rule was:

"One person being in fault will not dispense with another's using ordinary care for himself. Two things must concur to support this action, an obstruction in the road by the fault of the defendant, and no want of ordinary care to avoid it on the part of the plaintiff." 103 Eng Rep 927, quoted in Juenger, *Brief for Negligence Law Section of the State Bar of Michigan in Support of Comparative Negligence as Amicus Curiae,* Parsonson v Construction Equipment Co, 18 Wayne L Rev 3, 9 (1972).

Thus, the doctrine, although hotly defended and closely espoused is not "of great antiquity or dignity". *Sun Oil Co v Seamon,* 349 Mich 387, 394, 397–398; 84 NW2d 840 (1957) (opinion of TALBOT SMITH, J.). No explanation was apparently offered in *Butterfield,* although justifications have been since applied. As Justice TALBOT SMITH so brilliantly expressed in his opinion in *Seamon,* perhaps the most widely-accepted rationale for the

doctrine's expression and correspondingly warm reception was the Industrial Revolution.[23]

The first American case to adopt the doctrine is generally considered to be *Smith v Smith,* 19 Mass 621; 2 Pick 662 (1825), cited in 18 Wayne L Rev 9, with recovery denied to a plaintiff whose horse and wagon had hit a wood pile projecting into a public road. The concept appeared in our own state's jurisprudence as early as 1851, with our

---

[23] "It was not, as a matter of fact, introduced in its parent case with any discussion of pertinent principles or weighing of social consequences. (Bohlen, *Contributory Negligence,* 21 Harvard L Rev 233 [1908].) It was simply stated. It squinted at cause and smelled of the early 'last human wrongdoer' doctrine. Thus the *Butterfield* court remarked that with ordinary care the plaintiff (who, we observed, 'had been riding with great violence') could have seen the obstruction. Hence, 'the accident appeared to happen entirely from his own fault.' Its ready acceptance, indeed, is in part attributable to its linkage with medieval principles of causation (8 Holsworth, History of English Law [1922], p 459; James, *Last Clear Chance,* 47 Yale L J 704 [1938]). But only in part is it so attributable. The more significant factor was the burgeoning industrial revolution. We have discussed heretofore (e.g., *Salmon v Bagley Laundry Co,* 344 Mich 471, dissent 475 [74 NW2d 1 (1955)]; *Pazan v Unemployment Compensation Commission,* 343 Mich 587, dissent 592 [73 NW2d 327 (1955)]; *Powell v Employment Security Commission,* 345 Mich 455, dissent 462 [75 NW2d 874 (1956)]) the impact of the great revolution upon our legal doctrines and precedents as concerned workingmen and their families. But our entire society was affected since the dangers of the new mechanical devices *(e.g.,* the railroads) marched hand in hand with their blessings. Injuries multiplied. Recoveries, however, did not keep pace. The causes of denial were both philosophical and economic, social as well as legal. (Bohlen's *Contributory Negligence,* 21 Harvard L Rev 233 [1908], and Malone's *The Formative Era of Contributory Negligence,* 41 Ill L Rev 151 [1946].) In this pattern of denial, possibly essential thereto, was the doctrine of contributory negligence. On the substantive side it was perfectly consistent with the intense individualism of the common law. But it served, as well, a procedural purpose, for

" ' 'By adoption of the doctrine of contributory negligence, a court could, in many cases, find a welcome means by which to control, or even to eliminate, the jury. Specific features of plaintiff behavior, acts or omissions which would be apt to recur frequently in special types of cases, as for instance in railroad crossing accidents, could be handled by rule-of-thumb judgments, soon to be regarded as rules of law, leaving nothing to be considered by the jury. Thus, the issue of contributory negligence came to be "an ingenious device which gave the court almost complete freedom to accept or reject jury participation at its pleasure." (Turk, *Comparative Negligence on the March,* 28 Chicago-Kent L Rev 189, 199 [1950].)' " 349 Mich 398–399.

Court saying, in denying recovery to the plaintiff whose animals grazed on the railroad right of way,

"It is a well settled principle of law, that where an injury, of which a plaintiff complains, has resulted from the fault or negligence of himself, or where it has resulted from the fault or negligence of both parties, without any intentional wrong on the part of the defendant, an action cannot be maintained." *Williams v Michigan C R Co,* 2 Mich 259, 265 (1851),

citing no Michigan cases in support.

However, at least one early Michigan decision, although accepting the principle of contributory negligence as settled, did not do so uncritically. Thus, in *Lake Shore & M S R Co v Miller,* 25 Mich 274, 277 (1872), Chief Justice CHRISTIANCY criticized the rule's application:

"This rule, it is true, often, and perhaps generally, fails to produce justice; and, upon abstract principles of right and wrong, may be said to be frequently unjust in its operation. Justice might seem to require that each should bear the loss in the proportion they had respectively contributed to the injury."

However, we declined the invitation we ourselves raised to alter matters, because of what we considered to be the impossibility of ascertaining the proportion of injury attributable to each party, 25 Mich 277, and because we felt that since this rule was settled in our state, and in most of the others, we were not at liberty to revise it. 25 Mich 278.[24]

---

[24] Concern about the equity of contributory negligence did not die with *Miller,* and we took the opportunity on several occasions to comment on this dilemma. *See, e.g., Lanier v Minneapolis, S P & S S M R Co,* 209 Mich 302, 305–306; 176 NW 410 (1920). ("It may not be the better rule to say that however much the defendant was negligent the plaintiff cannot recover, if slight negligence upon his

Thus began a period where the question was disposed of by merely observing, "[t]he doctrine of comparative negligence does not obtain in this State." *Black v Bennett,* 335 Mich 197, 201; 55 NW2d 795 (1952). See, *e.g., Mynning v Detroit L & N R Co,* 59 Mich 257, 260; 26 NW 514 (1886); *Gold v Detroit United Railway,* 223 Mich 209, 212; 193 NW 775 (1923); *Grabowski v Seyler,* 261 Mich 473, 475; 246 NW 189 (1933).

At the same time, however, we made it clear that there were substantial limitations on the doctrine. For example, contributory negligence is no defense to wanton, willful, or reckless conduct. *Matta v Chicago & W R Co,* 69 Mich 109, 113; 37 NW 54 (1888); *Gibbard v Cursan,* 225 Mich 311, 320; 196 NW 398 (1923). Plaintiff's negligence "is a legally contributory cause 'if, but only if, it is a substantial factor in bringing about his harm' ". *Mack v Precast Industries Inc,* 369 Mich 439, 450; 120 NW2d 225 (1963).

Plaintiff may recover, even if contributorily negligent, if the finder of fact holds that defendant had the last clear chance to avoid the accident. *Zeni v Anderson,* 397 Mich 117, 144; 243 NW2d 270 (1976). Further, plaintiff may invoke last clear chance without first admitting contributory negligence. 17 Michigan Law & Practice, Negligence, § 83 (Cumm Supp, p 197).[25]

---

part contributed to his injuries. But this rule will doubtless be followed by this court until the legislature changes the rule to one of comparative negligence, leaving it to the jury to measure the degree of fault with which each party shall be charged."); *Sun Oil Co v Seamon,* 349 Mich 387, 394; 84 NW2d 840 (1957) (SMITH, J.); *Vanderah v Olah,* 387 Mich 643, 654; 199 NW2d 449 (1972) (WILLIAMS, J.).

[25] A doctrine similar to last clear chance was called "subsequent negligence" or "discovered peril," which required that the plaintiff's negligence put him or her in a position of peril and that the defendant must have discovered plaintiff's peril or should have discovered it by the exercise of ordinary care and diligence. *Dunn v Detroit,* 349 Mich 228, 234; 84 NW2d 501 (1957); *St John v Nichols,* 331 Mich 148, 156; 49 NW2d 113 (1951).

An unlawful act, in order to bar recovery, "must be one which the law recognizes as having a causal connection with the injury complained of. If the unlawful act was merely collateral to the cause of action sued upon, and did not proximately contribute to the injury, recovery is not barred." *Manning v Bishop of Marquette,* 345 Mich 130, 135; 76 NW2d 75 (1956).[26]

Plaintiff is no longer required to plead freedom from contributory negligence. It is now deemed to be a matter of affirmative defense to be pleaded and proved by defendant. *Dearborn v Bacila,* 353 Mich 99; 90 NW2d 863 (1958); GCR 1963, 111.7.

Being placed in a position of sudden emergency prevents plaintiff from being charged with contributory negligence even if the accident might have been avoided had he or she acted in a different manner. 17 Michigan Law & Practice, Negligence, § 78, pp 455–456.

Children under seven years old are incapable of contributory negligence as a matter of law. *Baker v Alt,* 374 Mich 492, 505; 132 NW2d 614 (1965).

Negligence subsequent to the injury is distinguished from contributory negligence, which is negligence which contributed proximately to cause the injury. If plaintiff fails to use due care to prevent or reduce damages subsequent to the injury complained of, he or she may not recover the enhanced damages. While the amount of damages may be reduced by such action or inaction, the action itself will not be barred. Thus, this doctrine of "avoidable consequences" is distinguished from contributory negligence and, in effect limits the latter doctrine to events which *cause* the original

---

[26] Plaintiff had been participating in an illegal bingo game in a church, and was permitted to recover for injuries sustained when she fell into a hole on the church premises.

injury, even though plaintiff's action or inaction in aggravating the injury may result in damage out of all proportion to the original event. See *Socony Vacuum Oil Co v Marvin,* 313 Mich 528, 544; 21 NW2d 841 (1946); *Delude v Raasakka,* 42 Mich App 665, 672; 202 NW2d 508 (1972), *rev'd on other grounds,* 391 Mich 296; 215 NW2d 685 (1974).

In short, this survey indicates two things. First, while contributory negligence is a bar to some plaintiffs, it is not a bar to all plaintiffs, and it may well be that the pattern of excused and nonexcused contributory negligence may amount to substantial unfairness. Second, our courts have not hesitated to change and in some cases eliminate the application of the court-made doctrine of contributory negligence.

## VII—Criticisms of Contributory Negligence

Alterations are not usually made in a doctrine which is serving well, and with which the bench, bar and public are satisfied. This is obviously not the case with contributory negligence, and attacks have been made, additionally, on the asserted justifications for the doctrine's existence in the first place. In fact, short of our Court's reluctance to say what they have been implying there seems to be no real reason to retain the concept.

In a well-reasoned and oft-quoted concurrence, Justice Talbot Smith, in a masterful analysis, rejected asserted justifications for the doctrine of contributory negligence, and noted that "the overwhelming movement of the courts is away from the old rule". *Sun Oil Co v Seamon,* 349 Mich 387, 394, 404–405; 84 NW2d 840 (1957).[27]

---

[27] Three members of the Court signed Justice Smith's opinion, three signed the dissent, and one concurred in the result reached by Justice Smith, but for different reasons. One member of the court took no part in the decision.

It is not necessary, therefore, to reiterate what has been done so well before. In summary, however, Justice SMITH noted, as have leading commentators and other judges, that none of the traditional explanations manages to support the doctrine—neither the "clean hands" requirement,[28] the prospect of promoting driver caution,[29] or even proximate cause.[30]

---

[28] Justice SMITH recognized there is no such general rule in damage actions and that, in fact, if defendant had the last clear chance to avoid the injury, the plaintiff will recover completely, even though negligent.

[29] "The difficulty with it [this argument] is its lack of realism. If the prospect of mutilation or loss of life will not deter the careless driver, it is to be doubted that the loss of a lawsuit (should it ever develop) will be more efficacious. Moreover, still in the realm of realism, let us not forget that for every contributorily negligent driver who is denied damages for his relief, we have another driver who set the machinery of disaster in motion but who completely escapes responsibility therefor through the doctrine of contributory negligence. The whip of deterrence to the one is counterbalanced by the boon of absolution to the other." 349 Mich 402.

"In fact, deterrence is better provided by a comparative negligence rule which penalizes both 'wrongdoers.' " Juenger, *supra,* 18 Wayne L Rev 22.

[30] Commentators have reserved sharp criticism for this rationalization.

"The attempt which common law courts have made to resolve every major problem of legal liability in tort into terms of causal relation marks the most glaring and persistent fallacy in tort law.

\* \* \*

"Such pronouncements ignore the fact that it is recognized on all hands that there may be two or more proximate causes of an injury. Moreover, it is wholly unnecessary to make this fictitious distinction in order to defeat the plaintiff. The defendant's negligence may clearly be a proximate cause of the injury, and still the plaintiff be defeated even though his negligence is also a proximate cause. This attempt to make the plaintiff's contributory negligence the 'sole' proximate cause is not only gratuitous and fictitious, but it ignores the true basis for defeating the plaintiff's action and introduces a false doctrine which throws the whole subject into confusion." Green, *Contributory Negligence and Proximate Cause,* 6 NC L Rev 3, 12 (1927).

"Most of the decisions have talked about 'proximate cause,' saying that the plaintiff's negligence is an intervening, insulating cause between the defendant's negligence and the injury. But this cannot be supported unless a meaning is assigned to proximate cause which is

Basically, the commentators have agreed that the most plausible explanation for the origin of the doctrine was the period of individualism and rapid development known as the Industrial Revolution. The policy, it is said, was designed to protect infant industries "from oversympathetic juries who regarded these corporation defendants as intruders, as well as immensely rich". Anno: *The Doctrine of Comparative Negligence and its Relation to the Doctrine of Contributory Negligence,* 32 ALR3d 463, 471. It has been argued, then, that if contributory negligence arose to protect rapidly growing industries during the Industrial Revolution, the "industrial complex is now well established, that most claims against individual defendants are covered by workmen's compensation statutes where negligence is not at issue, and that, in any event, all industrial enterprises, new or old, are generally protected from burdensome liability by insurance." 32 ALR3d 489–490. See also Prosser, *Comparative Negligence,* 51 Mich L Rev 465, 468 (1953).

Be that as it may, it is acknowledged that the United States is virtually the last stronghold of

---

found nowhere else. If two automobiles collide and injure a bystander, the negligence of one driver is not held to be a superseding cause which relieves the other of liability; and there is no visible reason for any different conclusion when the action is by one driver against the other." Prosser, *Comparative Negligence,* 51 Mich L Rev 465, 468 (1953).

"[I]t [the proximate cause explanation] simply does not fit the facts. In the typical case of contributory negligence both plaintiff and defendant would be liable to any third person injured by the accident. Thus if two automobile drivers collide at an intersection because neither is keeping a lookout, both are everywhere held liable to a bystander hurt by the collision. This of course means that the negligence of each is both a cause in fact and a proximate cause of the collision (and ensuing damage) under any tests having general currency among the courts today. Yet under the contributory negligence rule, neither driver can recover from the other for his own injuries." 2 Harper & James, Law of Torts, § 22.2, pp 1199–1200, quoted in 349 Mich 403.

contributory negligence, 51 Mich L Rev 466. The
most commonly stated reason for rejection of this
not-so-hoary doctrine is that it simply is not fair.

As high an authority as the United States Su-
preme Court has said so, for in rejecting the
suggestion that contributory negligence replace
the admiralty rule of comparative negligence, the
Court declared:

"The harsh rule of the common law under which
contributory negligence wholly barred an injured per-
son from recovery is completely incompatible with mod-
ern admiralty policy and practice. Exercising its tradi-
tional discretion, admiralty has developed and now
follows its own fairer and more flexible rule which
allows such consideration of contributory negligence in
mitigation of damages as justice requires. Petitioner
presents no persuasive arguments that admiralty
should now adopt a discredited doctrine which automat-
ically destroys all claims of injured persons who have
contributed to their injuries in any degree, however
slight." *Pope & Talbot, Inc v Hawn,* 346 US 406, 408–
409; 74 S Ct 202; 98 L Ed 143 (1953).

The California Supreme Court, in judicially
adopting comparative negligence, noted "the doc-
trine [contributory negligence] is inequitable in its
operation because it fails to distribute responsibil-
ity in proportion to fault." *Li v Yellow Cab Co of
California,* 13 Cal 3d 804, 810; 119 Cal Rptr 858;
532 P2d 1226, 1230 (1975).

The same indictment has been made in our own
Court in *Miller,*[31] in *Seamon,*[32] and in *Vanderah.*[33]

---

[31] "This rule, it is true, often, and perhaps generally, fails to
produce justice; and, upon abstract principles of right and wrong, may
be said to be frequently unjust in its operation. Justice might seem to
require that each should bear the loss in the proportion they had
respectively contributed to the injury." 25 Mich 277.

[32] "The plaintiff is being denied recovery because (and this we
declare as a matter of law) his was a portion of the fault. *But if we*

"The list of its [contributory negligence] distinguished critics reads like a tort law hall of fame. This list includes Campbell, Fleming, Green, Harper and James, Keeton, Leflar, Malone, and Pound." Juenger, *supra,* 18 Wayne L Rev 19.

Dean Prosser, the Reporter of the Restatement, which is still one of the last-gasp adherents to the doctrine, has himself written:

"The attack upon contributory negligence has been founded upon the obvious injustice of a rule which visits the entire loss caused by the fault of two parties on one of them alone, and that one the injured plaintiff, least able to bear it, and quite possibly much less at fault than the defendant who goes scot free. No one ever has succeeded in justifying that as a policy, and no one ever will." Prosser, *supra,* 51 Mich L Rev 469.

Also, on the positive side it has been said:

"[C]omparative negligence achieves better risk distribution than the contributory negligence defense allows. It permits this without abandoning the advantages of

---

*are to consider his fault, we should, in all fairness, consider the fault of the other.* (See Cooley, C. J., in *Detroit & M R Co v Van Steinburg,* 17 Mich 99, 119 [1868].) Not for reasons of abstract symmetry, but because of human experience: fault is rarely the monopoly of one party to an accident. Yet the doctrine of contributory negligence so treats it in our court today, denying the fundamental principle of right and justice that juries weigh the merits and demerits of each of the parties to a controversy." 349 Mich 403.

[33] "While I feel bound for the present by the recognition of this 'contributory negligence' doctrine by our case law and by the Restatement, I recognize the blunderbuss, all or nothing, character of the doctrine.

\* \* \*

"In short it appears that, while there is logic in our Michigan law of negligence which renders real justice in most cases, it is so rough hewn that in a number of cases its all or nothing rule gives either too much or too little. It is for this reason that a comparative negligence system appears necessary to render a more even level of justice." 387 Mich 659, 661.

the tort-litigation system. Comparative negligence is not pure plaintiff's law; rather, it permits a full implementation of the fault principle." Schwartz, *Comparative Negligence: Oiling the System,* 11 Trial 58 (July/August, 1975).

## VIII—COMPARATIVE NEGLIGENCE IN OPERATION

The most clear-cut response to the dilemma of contributory negligence has been to replace it with comparative negligence. Where contributory negligence bars all recovery where the plaintiff is negligent, the doctrine of comparative negligence operates to apportion damages according to the fault of each of the parties.

"By April of 1974, comparative negligence [had] * * * replaced contributory negligence as a complete defense in at least twenty-six states and Puerto Rico."[34] This has been achieved by statute and judicial decision. Schwartz, Comparative Negligence (Indianapolis: Allen Smith Co, 1974), § 1.1, p 3 (hereafter "Schwartz, Treatise").

Even in states such as our own which have retained the concept of contributory negligence, statutory exceptions exist which result, in effect, in a parallel comparative negligence system.

The example was set by the Federal employers' liability act, where plaintiff's contributory negligence reduces the amount of his or her recovery in proportion to his or her negligence in actions by an employee of an interstate railroad carrier against his employer. 45 USC 53. The concept also appears in the Federal Jones Act referring to seafarers who suffer injury in the course of employment, 46 USC 688, in the merchant marine

---

[34] Professor Schwartz subsequently noted that this number had gone to "over 30 states". Schwartz, *Comparative Negligence: Oiling the System,* 11 Trial 58 (July/August, 1975).

act, and the death on the high seas act, 46 USC 766.[35]

Thus, in our own state, a form of comparative negligence exists in employees' actions against railroad employers. Where the negligence of the railroad worker is less than that of the railroad, the employee's contributory negligence will not bar a recovery. MCLA 419.52; MSA 17.462.

The concept of avoidable consequences operates as well as a type of comparative negligence, for although it takes effect after the injury has already occurred, it requires the jury to first make a judgment that plaintiff was negligent and that this negligence added to his or her damage. Then the jury ascertains the proportion to which plaintiff's fault contributed to the injury, and reduces the recovery concomitantly. In this way, the same type of judgment and machinery which operate under comparative negligence already operate in our state to a limited extent.

## IX—MAY THE JUDICIARY INITIATE COMPARATIVE NEGLIGENCE?

For years, the response to the question of whether the courts could substitute comparative negligence for contributory negligence was negative, as courts, including our own, declared that while contributory negligence was unjust, for one reason or another, the task of abrogating the doctrine should be left to the Legislature.

Such reluctance has not been characteristic of our Court when confronted with other judge-made tort doctrines which have outlived their useful-

---

[35] These acts require apportionment of damages, even if plaintiff's negligence is equal to or greater than that of the defendant, and even if one's negligence is gross, and the other slight. Prosser, *Comparative Negligence,* 51 Mich L Rev 465, 481 (1953).

ness. Thus, our Court has heretofore believed that rules created by the court could be altered by the court. For example, we abrogated the defense of assumption of risk, *Felgner v Anderson,* 375 Mich 23; 133 NW2d 136 (1965), repudiated the doctrine of imputed negligence, *Bricker v Green,* 313 Mich 218; 21 NW2d 105 (1946), eliminated the privity requirement in actions for breach of an implied warranty, *Spence v Three Rivers Builders & Masonry Supply, Inc,* 353 Mich 120; 90 NW2d 873 (1958), overruled the common-law disability prohibiting the wife from suing for the loss of her husband's consortium, *Montgomery v Stephan,* 359 Mich 33; 101 NW2d 227 (1960), overruled the common law disallowance of recovery for negligently inflicted prenatal injury, *Womack v Buchhorn,* 384 Mich 718, 724–725; 187 NW2d 218 (1971); and even eliminated charitable immunity from negligence, *Parker v Port Huron Hospital,* 361 Mich 1; 105 NW2d 1 (1960).

This Court certainly has recognized our "corrective responsibility" to "refuse to blindly imitate * * * [the] dead past". *Dearborn v Bacila,* 353 Mich 99, 113; 90 NW2d 863 (1958).[36] In *Bacila* along with recognizing stare decisis Justice BLACK noted:

"Mr. Justice Holmes, commenting on 'The Path of the Law,' leads the thought-way here. He said (Collected Legal Papers, Oliver Wendell Holmes, p 187):

" 'It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.'

* * *

---

[36] *Bacila* overturned the requirement that plaintiff must prove freedom from contributory negligence.

" 'Stare decisis is not, like the rule of res judicata, a universal, inexorable command. "The rule of stare decisis, though one tending to consistency and uniformity of decision, is not inflexible. Whether it shall be followed or departed from is a question entirely within the discretion of the court, which is again called upon to consider a question once decided." Hertz v Woodman, 218 US 205, 212; 30 S Ct 621; 54 L Ed 1001 [1910]. * * * The court bows to the lessons of experience and the force of better reasoning, recognizing that the process of trial and error, so fruitful in the physical sciences, is appropriate also in the judicial function.' (Mr. Justice Brandeis in Burnet v Coronado Oil & Gas Co, 285 US 393, 405–408 [52 S Ct 443, 76 L Ed 815 (1932)].)" 353 Mich 112, 113–114.

In another opinion, the dilemma of stare decisis versus the need for change was well stated by Justice TALBOT SMITH:

"Thus again we reach the conflict that divides us, for the law, as Dean Pound put it, must be stable, and yet it cannot stand still. Were we to rule upon precedent alone, were stability the only reason for our being, we would have no trouble with this case.

\* \* \*

"The precedents of the older cases are not valid precedents. * * * They are out of harmony with the conditions of modern society. They do violence to our convictions and our principles. We reject their applicability. The reasons for the old rule no longer obtaining, the rule falls with it." 359 Mich 37, 49.[37]

While we heretofore have not taken the bit in our teeth and totally abolished contributory negligence, we have chipped away at it piece by piece by special exceptions to the rule of contributory negligence, such as wanton and wilful conduct,

---

[37] Finding the obstacles were judge-invented, he said, "they are herewith judge-destroyed". 359 Mich 49.

last clear chance, sudden emergency, children un-
der seven, etc., *vide supra.* But it is perfectly clear
that we have the power and the precedent to
change an established rule which has, as has the
rule of contributory negligence, outgrown its use-
fulness. We have even done it where the rule of
law was legislatively, not judicially, created. *E.g.,*
*Manistee Bank & Trust Co v McGowan,* 394 Mich
655; 232 NW2d 636 (1975), in which we found that
the guest passenger statute, after 40 years, was no
longer experimental and could no longer be justi-
fied in terms of any stated legislative policy. (It
should be emphasized that the guest act was a
creature of the Legislature, not of the judiciary.)

It is said that if the arguments against contribu-
tory negligence were so persuasive, the Legislature
would have changed things long ago. But the
Legislature has not acted.[38] Therefore, in the ab-
sence of such a mandate, the argument is that we
should not act either.

As a practical matter, there are a variety of
reasons why bills or ideas do or do not become law
and it is not the role of the courts to guess what
legislative silence means. As Justice VOELKER
wrote when confronted with the argument that:

"legislative silence and inaction for 37 years * * *
amounts to a tacit recognition of its [a doctrine's]
soundness by which we must irrevocably be bound. Now
this beguiling doctrine of legislative assent by silence
possesses a certain undeniable logic and charm. Nor are
we oblivious to the flattery implicit therein; double
flattery, in fact; flattery both to the profound learning
and wisdom of the particular supreme court which has

---

[38] Apparently comparative negligence bills have began the legisla-
tive process in our state, but died in committee. *See,* Brief for Amicus
Curiae, Michigan Trial Lawyers Association, *Parsonson v Construction*
*Equipment Co, supra,* p 27. Schwartz, Treatise, § 1.4, p 14. Neef,
*Comparative Negligence,* 27 Mich St Bar J 34, 35, fn 17 (May, 1948).

spoken, and flattery to a presumably alert and eagerly responsive State legislature. One pictures the legislators of our various States periodically clamoring and elbowing each other in their zeal to get at the pearls of wisdom embalmed in the latest decisions and advance sheets of their respective supreme courts—and thenceforth indicating their unbounded approval by a vast and permanent silence.

"Yet there are several dark shadows in this picture. For one, it suggests a legislative passion for reading and heeding the decisions of our supreme courts which we suspect may be scarcely borne out by the facts. For another, pushed too far such a doctrine suggests the interesting proposition that it is the legislatures which have now become the ultimate courts of last resort in our various States; that if they delay long enough to correct our errors those errors thus become both respectable and immutably frozen; and, finally, the larger and more dismal corollary that if enough people persist long enough in ignoring an injustice it thereby becomes just. We reject as both un-Christian and legally unsound the hopeless doctrine that this Court is shackled and helpless to redeem itself from its own original sin, however or by whomever long condoned.

"Courts throughout the land have long split over this doctrine of legislative acquiescence by silence. The usual arguments for recognizing it are that it gives stability and sureness to the law; that 'rights' thus acquired can thus only be disturbed at regular and predictable intervals by but one branch of the government, the legislative; and, finally, that to disregard the doctrine amounts to judicial legislating. Now we recognize that a court should not lightly overrule an interpretation of a statute that has been the law for 37 years, but we also see little justice or utility in continuing to give stability or sureness to an unfortunate rule of law." *Van Dorpel v Haven-Busch Co,* 350 Mich 135, 145–146; 85 NW2d 97 (1957).

The real problem, we think, confronting the court which desires to undo the sins of the past, is that, unlike reversing a statute or an ordinary

common-law doctrine, the elimination of contribu-
tory negligence requires a *substitution.* It is not
enough to say that we are no longer to be ruled by
the not-so-ancient doctrine of contributory negli-
gence. We must then opt for a form of comparative
negligence to take its place.

But is that so much more difficult than the
imposition of a brand new doctrine upon the law
when there was nothing there before it? For is
that not what happened when the courts created
contributory negligence in the first place?

The task is difficult, but it has not been shirked
by others before us, and we will not decline this
responsibility now. For while it is true that most
courts have not chosen to make the change, within
recent years others have done so. We have to
guide us not only the experience of those states
which have adopted comparative negligence by
statute, but those which have done so by way of
judicial decision. There is, further, the Federal
experience in admiralty and under FELA for
whatever additional reference may be necessary.

## X—ACTION BY OTHER COURTS

We turn to the task before us with the under-
standing that we are dealing with a torts problem,
and courts are no strangers to the reform of tort
law of judicial origin. This makes the question of
judicial competence to make serious choice per-
haps of somewhat less concern than an exploration
of alternatives in other areas. The courts' day-to-
day confrontation with the problem of torts and
the resulting "interpretative continuity" probably
provide the courts with as comprehensive an in-
sight into the question of tort reform as the com-
mittee system and public hearings provide the

Legislature. Keeton, *Creative Continuity in the Law of Torts,* 75 Harv L Rev 463 (1962).[39]

The judiciary has as well the ability to fill in details in this area in subsequent cases. Comparative negligence seems ideally suited to such judicial clarification, for the statutes are at best rather sketchy "and leave the very same ancillary questions [which would be ordinarily left to judicial decision] likewise to the courts for future solution". Fleming, *The Supreme Court of California 1974–1975, Foreword: Comparative Negligence at Last—By Judicial Choice,* 64 Cal L Rev 239, 281 (1976).

Judicial rulings may also give affected parties an opportunity to prepare themselves for the change of law, because it is possible to give a ruling prospective operation only, *Great N R Co v Sunburst Oil & Refining Co,* 287 US 358, 364; 53 S Ct 145; 77 L Ed 360 (1932), with the exception perhaps of the successful appellants.

Additionally, the court may, just as the Legislature does, look to statutes in other jurisdictions for guidance,[40] *Moyses v Spartan Asphalt Paving Co,* 383 Mich 314, 334; 174 NW2d 797, 806 (1970)

---

[39] This argument has been less kindly construed to say that since the court has confused the law so much, it itself is best qualified "to undertake drastic surgery". Fleming, *Foreword: Comparative Negligence at Last—By Judicial Choice,* 64 Cal L Rev 239, 279–280, fn 163 (1976).

[40] Schwartz reminds us that Justice Harlan, writing for the United States Supreme Court in creating an action for wrongful death under Federal maritime law, looked "to legislation in other areas to fashion a remedy". Schwartz, Treatise, § 21.7, p 359. Wrote Harlan:

"It has always been the duty of the common-law court to perceive the impact of major legislative innovations and to interweave the new legislative policies with the inherited body of common-law principles —many of them deriving from earlier legislative exertions." *Moragne v States Marine Lines, Inc,* 398 US 375, 392; 90 S Ct 1772; 26 L Ed 2d 339 (1970).

Schwartz notes, "The variety of wrongful death alternatives is certainly as great as those in comparative negligence." Schwartz, Treatise, § 21.7, p 359.

(contribution among joint tortfeasors),[41] to commentators, *Zeni v Anderson*, 397 Mich 117; 243 NW2d 270 (1976) (Restatement position on last clear chance), and to what other courts have done.

Three state courts of last resort, in Florida, California and Alaska, and the United States Supreme Court, have recently adopted comparative negligence systems,[42] the states substituting "pure" comparative negligence for the contributory negligence law, and the United States Supreme Court changing the admiralty rule of divided damages to liability proportional to fault.

[41] Professor Keeton suggests that it is possible that a judicial decision may in turn stir legislative reaction with the possibility that "decisional and statutory creativity" will serve "in combination to bring about reform that neither alone would have been likely to achieve". Keeton, *Creative Continuity in the Law of Torts*, 75 Harv L Rev 463, 475 (1962), quoted in Comment, *Judicial Activism in Tort Reform: The Guest Statute Examplar and a Proposal for Comparative Negligence*, 21 UCLA L Rev 1566, 1601 (1974).

[42] Prior to the current judicial activity, the Georgia courts, in what Prosser has characterized a "remarkable tour de force of construction", Torts (4th ed), § 67, p 436, adopted a form of comparative negligence by applying to all types of negligence cases an apportionment of damages statute concerning actions against railroad companies when plaintiff has been contributorily negligent. As outlined in *Smith v American Oil Co*, 77 Ga App 463, 491; 49 SE2d 90, 108 (1948), disapproved on other grounds involving applicability of last clear chance to defendant, *Grayson v Yarbrough*, 103 Ga App 243, 246; 119 SE2d 41, 43–44 (1961), the Georgia doctrine is:

"(1) if the negligence of the plaintiff equals or exceeds that of the defendant a recovery cannot be had by the plaintiff, (2) if the plaintiff is negligent in a lesser degree than the defendant a recovery may be had, and (3) if the plaintiff is negligent in a lesser degree than the defendant there may be a recovery but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to the plaintiff." Anno: *The Doctrine of Comparative Negligence and its Relation to the Doctrine of Contributory Negligence*, 32 ALR3d, § 7[a], p 479.

The Tennessee rule of "remote contributory negligence," adopted in *Bejach v Colby*, 141 Tenn 686; 214 SW 869 (1919), permits plaintiff to recover only if the contributory negligence "remotely" contributed to the injury, regardless of the extent of the negligence, with the amount of damages reduced by the amount of contributory negligence. 32 ALR3d 479–480. Prosser criticizes this as resulting in the apportionment of damages only when defendant has the last clear chance. Prosser, *Comparative Negligence*, 51 Mich L Rev 465 (1953).

On July 10, 1973, the Supreme Court of Florida held in *Hoffman v Jones,* 280 So 2d 431; 78 ALR3d 321 (Fla, 1973),

"that a plaintiff in an action based on negligence will no longer be denied any recovery because of his contributory negligence.

\* \* \*

"A plaintiff is barred from recovering damages for loss or injury caused by the negligence of another only when the plaintiff's negligence is the sole legal cause of the damage, or the negligence of the plaintiff and some person or persons other than the defendant or defendants was the sole legal cause of the damage." 280 So 2d 438.

The Court acknowledged that, following a gubernatorial veto of a comparative negligence statute 30 years before, the Legislature had "done little to discard the harsh and inequitable contributory negligence rule, perhaps because it considers the problem to be a judicial one". 280 So 2d 438.

The Court felt it should act because,

"[s]ince we definitely consider the problem to be a judicial one, we feel the time has come for this Court to join what seems to be a trend toward almost universal adoption of comparative negligence. A primary function of a court is to see that legal conflicts are equitably resolved. In the field of tort law, the most equitable result that can ever be reached by a court is equation of liability with fault. Comparative negligence does this more completely than contributory negligence, and we would be shirking our duty if we did not adopt the better doctrine." 280 So 2d 438.

"Whatever may have been the historical justification for it, today it is almost universally regarded as unjust and inequitable to rest an entire accidental loss on one of the parties whose negligent conduct combined with

the negligence of the other party to produce the loss."
280 So 2d 436.

The Court found it had authority to act to
abolish contributory negligence because contribu-
tory negligence was a judicial creation.[43]

Even without authority based on the judicial
origin of the doctrine, the Court found an obliga-
tion to make the change because, after an analysis
similar to that we have undergone, it found no
compelling justification for the doctrine.

The rule adopted was one of "pure" comparative
negligence.

"If plaintiff and defendant are both at fault, the
former may recover, but the amount of his recovery
may be only such proportion of the entire damages
plaintiff sustained as the defendant's negligence bears
to the combined negligence of both the plaintiff and the
defendant. For example, where it is found that the
plaintiff's negligence is at least equal to that of the
defendant, the amount awarded to the plaintiff should
be reduced by one-half from what it otherwise would
have been." 280 So 2d 438.

California acted next, and in 1975 in *Li v Yellow
Cab Co of California,* 13 Cal 3d 804; 119 Cal Rptr
858; 532 P2d 1226 (1975), the Supreme Court of

[43] The Florida Court had to confront the problem of a statute which
declared "the general English common and statute law in effect on
July 4, 1776, was to be in force in Florida except to the extent it was
inconsistent with Federal constitutional and statutory law and acts of
the state Legislature. (Fla Stat Ann § 2.01 [West])", *Li v Yellow Cab
Co of California,* 13 Cal 3d 804, 813–814; 119 Cal Rptr 858; 532 P2d
1226, 1233 (1975). It found that contributory negligence did not exist
as a clear-cut, common-law rule prior to 1809, but only as a matter of
judicial thought, as opposed to judicial pronouncement. Finding that
pre-1809 common law was not clear and free from doubt, it was
therefore not part of the English common law, 280 So 2d 434–435.
This type of problem, however, does not face us today.

The extensive annotation at 78 ALR3d 339 on comparative negli-
gence became available after this case was submitted for decision.

that state abrogated the doctrine of contributory negligence and adopted comparative negligence.[44]

To the California Court, the superiority of comparative negligence was so clear that,

"It is unnecessary for us to catalogue the enormous amount of critical comment that has been directed over the years against the 'all-or-nothing' approach of the doctrine of contributory negligence. The essence of that criticism has been constant and clear: the doctrine is inequitable in its operation because it fails to distribute responsibility in proportion to fault. Against this have been raised several arguments in justification, but none have proved even remotely adequate to the task." 13 Cal 3d 810–811; 532 P2d 1230–1231.

After reviewing some practical and administrative objections to adopting comparative negligence, the Court found these did not "[diminish] our conviction that the time for a revision of the means for dealing with contributory fault in this state is long past due and that it lies within the province of this court to initiate the needed change

---

[44] The California Court found first that § 1714 of the state civil code appeared to provide specifically for contributory negligence mitigated by last clear chance. 13 Cal 3d 821; 532 P2d 1238. The section read:

"Everyone is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself."

However, the Court found that the code was not intended to freeze the law as it was in 1872 at the time of its adoption, and that the section be interpreted so as to give "dynamic expression to the fundamental precepts which it summarizes". 13 Cal 3d 821–822; 532 P2d 1238–1239.

The Court found those precepts to be "that one whose negligence has caused damage to another should be liable therefor. The second is that one whose negligence has contributed to his own injury should not be permitted to cast the burden of liability upon another." 13 Cal 3d 822; 532 P2d 1239. Further the Legislature wished to hold out "the hope of recovery to the negligent plaintiff in some circumstances". The only such technique available at the time, explained the Court, was last clear chance. 13 Cal 3d 822; 532 P2d 1239.

by our decision in this case". 13 Cal 3d 826; 532 P2d 1241.

The Court then proceeded to adopt the "pure" form of comparative negligence, rejecting the "50 percent" system and its variants,[45] as merely applying "the lottery aspect of the contributory negligence rule to a different ground". 13 Cal 3d 827; 532 P2d 1242.[46]

The decision noted that the Wisconsin 50 percent system led to numerous appeals on the narrow issue of whether plaintiff's negligence was equal to defendant's, and that, because of the "development of arcane classifications of negligence according to quality and category", four members of the Wisconsin Supreme Court indicated a willingness to adopt the pure form if the Legislature failed to act "with reasonable dispatch". The majority, however, rejected the invitation, because they concluded that the Legislature by writing a statute had occupied the field. 13 Cal 3d 828; 532 P2d 1243, citing *Vincent v Pabst Brewing Co,* 47 Wis 2d 120; 177 NW2d 513 (1970).[47]

[45] The 50 percent comparative negligence form in this context permits plaintiff to recover a proportion of the damages up to the point at which plaintiff's negligence is equal to or greater than that of defendant. Thus, a plaintiff whose negligence is greater than that of defendant is barred from recovery.

[46] The Court quoted Prosser's severe criticism:

"It is obvious that a slight difference in the proportionate fault may permit a recovery; and there has been much justified criticism of a rule under which a plaintiff who is charged with 49 percent of the total negligence recovers 51 percent of his damages, while one who is charged with 50 percent recovers nothing at all." Prosser, *Comparative Negligence,* 41 Cal L Rev 1, 25 (1953), quoted at 13 Cal 3d 828; 532 P2d 1243.

The Court also quoted Juenger, *Brief for Negligence Law Section of the State Bar of Michigan in Support of Comparative Negligence as Amicus Curiae,* Parsonson v Construction Equipment Co, *supra,* 18 Wayne L Rev 3, 50 to the effect that "[t]he partial [50%] rule simply lowers, but does not eliminate, the bar of contributory negligence". 13 Cal 3d 828; 532 P2d 1243.

[47] Wisconsin has since changed its form of the 50 percent system to

The California court pronounced the "pure" rule of comparative negligence as follows:

"[T]he contributory negligence of the person injured in person or property shall not bar recovery, but the damages awarded shall be diminished in proportion to the amount of negligence attributable to the person recovering." 13 Cal 3d 829; 532 P2d 1243.

The Alaska Supreme Court also adopted pure comparative negligence in *Kaatz v State,* 540 P2d 1037 (Alas, 1975). The rationale was simply stated:

"We are convinced that the pure system is the one which is the simplest to administer and which is best calculated to bring about substantial justice in negligence cases. It is the system most favored by modern jurists and commentators." 540 P2d 1049.

Still another judicial vote on the side of pure comparative negligence was cast by the United States Supreme Court, when it replaced the admiralty rule of divided damages[48] with a rule providing for the allocation of liability for damages in proportion to the relative fault of each party. *United States v Reliable Transfer Co, Inc,* 421 US 397; 95 S Ct 1708; 44 L Ed 2d 251 (1975).

A review of the United States Supreme Court's rationale is applicable to the problem before us and serves to reinforce our reasoning in the case at bar.

permit plaintiff to recover if his/her negligence is equal to or less than that of defendant; prior to the change the statute permitted recovery only if plaintiff was *less* negligent than defendant. Schwartz, Treatise, § 3.5(B), p 77.

[48] Under this doctrine, the property damage in a maritime collision or stranding was divided equally among the parties involved whenever they were each contributorily negligent, regardless of the relative degree of their fault.

First, the Court noted that while the precise origins of the divided damages rule "are shrouded in the mists of history", 421 US 401, the divided damages rule did not emerge "as we know it" until early in the 19th century, and was adopted by the United States Supreme Court in 1855. 421 US 402.

"The rule was adopted because it was then the prevailing rule in England, because it had become the majority rule in the lower federal courts, and because it seemed the 'most just and equitable, and * * * best [tended] to induce care and vigilance on both sides, in the navigation.' *Id,* at 177–178. There can be no question that subsequent history and experience have conspicuously eroded the rule's foundations." 421 US 402–403 (notes omitted), quoting *The Schooner Catharine v Dickinson,* 58 US (17 How) 170; 15 L Ed 233 (1855).

The Court then recognized that not only had England abandoned the rule, but the Brussels Collision Liability Convention of 1910 provides for apportionment of damages on the basis of "degree" of fault. Thus, "the United States is now virtually alone among the world's major maritime nations in not adhering to the Convention with its rule of proportional fault". 421 US 403–404.

The Court also observed that lower courts, although following the rule of divided damages, "have more recently followed it only grudgingly, terming it 'unfair,' 'illogical,' 'arbitrary,' 'archaic and frequently unjust' ", 421 US 404.

They found "[i]t is no longer apparent, if it ever was, that this Solomonic division of damages seems to achieve even rough justice". 421 US 405. " 'This result hardly commends itself to the sense of justice any more appealingly than does the

common law doctrine of contributory negligence
* * * ' ' ". 421 US 405.[49]

As to "escape valves",[50] the Court noted it had
attempted to escape the "patent harshness" of the
equal damages rule by applying the "major-minor"
fault doctrine.[51] However, they now observed,

"But this escape valve, in addition to being inher-
ently unreliable, simply replaces one unfairness with
another. That a vessel is primarily negligent does not
justify its shouldering all responsibility, nor excuse the
slightly negligent vessel from bearing any liability at
all. See *Tank Barge Hygrade v The Gatco New Jersey,*
250 F2d 485, 488 (CA 3 [1957]). The problem remains
where it began with the divided damages rule." 421 US
406.[52]

---

[49] The Court also attacked a rationalization for the divided damages
rule which has been utilized in attempting to justify contributory
negligence.

"It is difficult to imagine any manner in which the divided damages
rule would be more likely to 'induce care and vigilance' than a
comparative negligence rule that also penalizes wrongdoing, but in
proportion to measure of fault. A rule that divides damages by degree
of fault would seem better designed to induce care than the rule of
equally divided damages, because it imposes the strongest deterrent
upon the wrongful behavior that is most likely to harm others." 421
US 405, fn 11.

[50] Last clear chance, of course, is one such device serving this
function in the area of contributory negligence.

[51] *See, e.g., The City of New York,* 147 US 72, 85; 13 S Ct 211; 37 L
Ed 84 (1893).

"Where fault on the part of one vessel is established by uncontra-
dicted testimony, and such fault is, of itself, sufficient to account for
the disaster, it is not enough for such vessel to raise a doubt with
regard to the management of the other vessel. There is some pre-
sumption at least adverse to its claim, and any reasonable doubt with
regard to the propriety of the conduct of such other vessel should be
resolved in its favor."

*See also The Victory & The Plymothian,* 168 US 410; 18 S Ct 149;
42 L Ed 519 (1897); *The Umbria,* 166 US 404; 17 S Ct 610; 41 L Ed
1053 (1897); *The Oregon,* 158 US 186; 15 S Ct 804; 39 L Ed 943 (1895);
*The Ludvig Holberg,* 157 US 60; 15 S Ct 477; 39 L Ed 620 (1895);
*United States v Reliable, supra,* 421 US 406, fn 11.

[52] Of course the same sort of criticism has been directed against last
clear chance in its relation to contributory negligence.

.

As to the attempted justification "by the difficulty of determining comparative degrees of negligence when both parties are concededly guilty of contributing fault", the Court acknowledges:

"Although there is some force in this argument, it cannot justify an equal division of damages in every case of collision based on mutual fault. When it is impossible fairly to allocate degrees of fault, the division of damages equally between wrongdoing parties is an equitable solution. But the rule is unnecessarily crude and inequitable in a case like this one where an allocation of disparate proportional fault has been made. *Potential problems of proof in some cases hardly require adherence to an archaic and unfair rule in all cases.* Every other major maritime nation has evidently been able to apply a rule of comparative negligence without serious problems, see Mole & Wilson, *A Study of Comparative Negligence,* 17 Cornell LQ 333, 346 (1932); *In re Adams' Petition,* 125 F Supp 110, 114 (SDNY [1954]), *aff'd* 237 F2d 884 (CA 2 [1956]), and in our own admiralty law a rule of comparative negligence has long been applied with no untoward difficulties in personal injury actions." 421 US 407 (emphasis added).

The Court rejected the argument that the equal apportionment rule promoted out-of-court settlements, noting as well that,

"Experience with comparative negligence in the personal injury areas teaches that a rule of fairness in court will produce fair out-of-court settlements.[13] But even if this argument were more persuasive than it is, it could hardly be accepted. For, at bottom, it asks us to continue the operation of an archaic rule because its facile application out of court yields quick, though inequitable, settlements, and relieves the courts of some litigation. Congestion in the courts cannot justify a legal rule that produces unjust results in litigation simply to encourage speedy out-of-court accommodations. 421 US 408.

"13 The rule of comparative negligence applicable to personal injury actions in our maritime law, see the Jones Act, 46 USC 688; Death on the High Seas Act, 46 USC 766, does not appear to discourage the negotiation of settlements in such litigation. It has been reported, for example, that of the marine personal injury cases involving a federal question that were terminated in fiscal year 1974, only 9.6% ever reached trial. 1974 Proceedings of the Judicial Conference of the United States and Annual Report of the Director of the Administrative Office of the United States Courts, Table C4, p 416."

As for the power of the judiciary to make such a change in the face of congressional silence, the Supreme Court was equally persuasive:

"This Court, in other appropriate contexts, has not hesitated to overrule an earlier decision and settle a matter of continuing concern, even though relief might have been obtained by legislation. See *Burnet v Coronado Oil & Gas Co,* 285 US 393, 406 fn 1 [52 S Ct 443; 76 L Ed 815 (1932)] (Brandeis, J., dissenting) (collecting cases)." 421 US 409, fn 15.

The stare decisis argument was equally convincingly attacked:

"As the authors of a leading admiralty law treatise have put the matter:

" '[T]here is no reason why the Supreme Court cannot at this late date "confess error" and adopt the proportional fault doctrine without Congressional action. The resolution to follow the divided damages rule, taken 120 years ago, rested not on overwhelming authority but on judgments of fact and of fairness which may have been tenable then but are hardly so today. No "vested rights," in theory or fact, have intervened. The regard for "settled expectation" which is the heart-reason of * * * *stare decisis* * * * can have no relevance in respect to such a rule; the concept of "settled expectation" would be reduced to an absurdity were it to be applied to a rule of damages for negligent collision. The abrogation of the rule would not, it seems, produce any disharmony with other branches of the maritime law,

general or statutory.' Gilmore & Black [The Law of Admiralty (2d ed)], p 531 (footnote omitted)." 421 US 410.

The rule of divided damages died, and the Court held that:

"[W]hen two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault." 421 US 411.

We are unconvinced that the arguments so well negated by three state courts and by the United States Supreme Court in a related area should hold sway here.

The rule which made its appearance when the adversaries were horse and buggy versus railroad,[53] and which may have served a function in

---

[53] More accurately, in the case of *Butterfield,* it was galloping horse versus stick in the road.

"Even if the contributory negligence rule were not clearly unnecessary in the industrial context, the standard it requires is incompatible with the age of the automobile. The coming of the automobile has increased the qualitative and quantitative injustice of the contributory negligence rule. The standard of care necessary for the safe operation of an automobile is much higher than that involved in the direction of a team of horses. The ordinary nineteenth-century man could easily live his life without ever being in a situation where a moment's carelessness could cause a loss of the magnitude risked by present-day man every time he drives his car. Indeed the complexity of the instrumentalities of modern life combined with the speed with which decisions must be acted upon has led some to suggest that fault itself is an outmoded basis for liability. At least in those situations where danger must be perceived and avoided at a mile-a-minute rate, few involved in accidents can be said to be completely free from fault, and the injustice of the doctrine of contributory negligence is apparent", Comment, *Judicial Adoption of a Comparative Negligence Rule in Illinois,* 1967 U Ill Law Forum 351, 354.

the days of the Industrial Revolution serves no function today. We the judiciary who created that rule, today hereby abrogate it.

## XI—What Type of Comparative Negligence is Appropriate?

We turn now to determining the form of comparative negligence which is best suited to our state.

We are convinced, as was the United States Supreme Court and the other courts which have adopted the comparative negligence doctrine, that the "pure" form is preferable to any other.[54]

The "pure" form does not "unjustly enrich" anyone. For example, if an accident is wholly the fault of one party, then that party would not, of course, recover damages. If an injured plaintiff was 51% to blame, there still remains 49% of the fault which was not plaintiff's,[55] and for which therefore the person who caused that much of the injury should be liable.

The rule preventing recovery if plaintiff's negligence exceeds 50% of the total fault is just as arbitrary as that which completely denies recovery. Is the person who is 49% negligent that much more deserving than the one who is 51% negligent?[56]

We acknowledge that even under the "pure"

---

[54] Of course, should it so desire, the Legislature has the power to reinstate contributory negligence or to modify this rule of comparative negligence.

[55] Prosser reports that in pure comparative negligence jurisdictions one does not find 99% situations. Prosser, *Comparative Negligence,* 51 Mich L Rev 465, 494 (1953) ("[T]he writer has found no such cases.")

[56] "A person who violates *one* rule of law, even though it be for his own safety, is not for that reason an outlaw and deprived of the protection afforded him by *other* rules of law designed for his benefit." Green, *Contributory Negligence and Proximate Cause,* 6 NC L Rev 3, 5–6 (1927).

form of comparative negligence there will be appeals concerning the percentage of award,[57] but it is undoubtedly more compelling to appeal when you have been awarded nothing than when you have received some compensation.[58] However, just as we did not reach our decision on contributory negligence because of the anticipated number of case filings, we will not reach our decision on the form of comparative negligence because of an equally unpredictable element, the anticipated number of appeals.

Commentators acknowledge that the hybrid 50% rule leads to strange results.

"It is obvious that a slight difference in the proportionate fault may permit a recovery; and there has been much justified criticism of a rule under which a plaintiff who is charged with 49 per cent of the total negligence recovers 51 per cent of his damages, while one who is charged with 50 per cent recovers nothing at all." Prosser, *supra,* 51 Mich L Rev 493–494.

See also Keeton, *Comment on* Maki v Frelk, 21 Vand L Rev 906 (1968); Leflar, *Comment on* Maki v Frelk, 21 Vand L Rev 918 (1968).

"If two parties are injured in one accident, as in an automobile collision, the one who is slightly more negli-

[57] In a decision overturning as "perverse" a judgment for defendant under Wisconsin's statute, based upon the jury's finding of equal fault, Chief Justice Hallows wrote:

"Personally, the writer of this opinion thinks this case is another example of why the comparative negligence law of this state should be changed so that a plaintiff could recover although his negligence equaled or exceeded that of the defendant or defendants." *Spath v Sereda,* 41 Wis 2d 448, 453; 164 NW2d 246, 248 (1969).

[58] We also reject the form of comparative negligence which would require plaintiff to be more negligent than each defendant. The unfairness of this approach is exemplified if, for example, plaintiff and two other defendants were *equally* negligent. This rule would prevent plaintiff from recovering from any defendant, even though the others were, as a group, more negligent than plaintiff.

gent than the other must bear his own loss and close to one-half of the losses of the other. The problem is compounded where the combined negligence of several parties produces the injuries resulted. In a three-car collision a plaintiff whose negligence amounts to only one-third recovers nothing." Brief for Amicus Curiae Negligence Law Section of the State Bar of Michigan in Support of Comparative Negligence, *Parsonson v Construction Equipment Co,* 386 Mich 61; 191 NW2d 465 (1971), p 40.

What the hybrid rule does in fact is not eliminate contributory negligence, but merely lower the barrier.

The doctrine of pure comparative negligence does not allow one at fault to recover for one's own fault, because damages are reduced in proportion to the contribution of that person's negligence, whatever that proportion is. The wrongdoer does not recover to the extent of his fault, but only to the extent of the fault of others. To assume that in most cases the plaintiff is more negligent than the defendant is an argument not based on equity or justice or the facts. What pure comparative negligence does is hold a person fully responsible for his or her acts and to the full extent to which they cause injury. That is justice.

This is the system of comparative negligence judicially adopted in Florida, California, Alaska, and by the United States Supreme Court to replace the equal division rule in admiralty actions. It is the system in the FELA, the Merchant Marine Act, the Jones Act, and Death on the High Seas Act. It is simplest to administer where multiple defendants are concerned. The system in operation has not led "to runaway verdicts for negligent plaintiffs". Schwartz, Treatise, § 3.2, p 52.

We recognize that the 50% system has been the

most popular among those legislatively adopted. Schwartz, § 3.5, p 73. But it is not the system which we believe will really do justice.

We recognize that the doctrine of last clear chance served to mitigate the harshness of contributory negligence and therefore its retention might appropriately be reconsidered once pure comparative negligence is adopted.

Although not mandatory, the trial court may find it desirable to utilize the special verdict procedure, in cases in which comparative negligence is an issue. GCR 1963, 514.[59] Thus, for example, the jury may be asked the percentage of fault attributable to each party, and the damage each party suffered.

Because of the extensive changes precipitated by this decision, the rule of comparative negligence will apply only to the present case and to those cases filed after the date of this decision.

## XII—CONCLUSION

We are remanding the instant case for trial because of errors committed in the charge to the jury.

Because the facts of this case raise once again the question of whether we should continue to apply the harsh rule of contributory negligence, we have today rejected that doctrine and have adopted the pure form of comparative negligence. Thus, as to the instant case and all cases filed after the date of this decision, where the negligence of plaintiff is an issue, the amount of damages recovered by plaintiff shall be reduced in proportion to the extent of plaintiff's fault. Fur-

---

[59] "The court may require the jury to return a special verdict in the form of a special written finding upon each issue of fact and in such cases no general verdict shall be returned."

ther, as to cases filed after the date of this deci-
sion, contributory negligence is hereby abolished.

Reversed and remanded.

Costs to plaintiffs.

KAVANAGH, C. J., and LEVIN, J., concurred with
WILLIAMS, J.

## APPENDIX

### QUESTIONS AND ANSWERS ABOUT COMPARATIVE NEGLIGENCE

Whether comparative negligence should be
adopted was debated before our Court several
years ago. *Parsonson v Construction Equipment
Co,* 386 Mich 61; 191 NW2d 465 (1971). Although
the case was decided on other grounds, the parties
and amici curiae[1] raised and discussed some of the
principal questions about comparative negligence.
These are summarized *infra.*

### (1) Is Comparative Negligence Confusing?

Those who argue that comparative negligence is
both confusing and difficult to administer both
underestimate the modern jury and misread the
facts. Juenger, *supra,* 18 Wayne L Rev 31.

Even under contributory negligence, juries every
day make subtle judgments concerning appropri-
ate damages attributable to defendant's negligence
which should be awarded to deserving plaintiffs.
And, as we have seen, under the doctrine of avoid-
able consequences, almost the same kind of reason-

---

[1] Amici briefs were submitted by the Association of Defense Trial
Counsel, Michigan Trial Lawyers Association, Negligence Law Sec-
tion, State Bar of Michigan, in opposition to comparative negligence,
and Negligence Law Section, State Bar of Michigan, in support of
comparative negligence.

ing which would be used in a comparative negligence case in analyzing fault *before* the injury occurs, is used in analyzing fault *after* the injury occurs.

But it is not necessary to conduct this analysis on a theoretical basis. An analysis of comparative negligence systems in states in which the system operates is possible to determine whether indeed the juries are doing the job required. Apparently, the answer is that juries perform their function in these jurisdictions without significant problems.

"Juries have been making apportionments on the basis of comparative negligence with apparent success in Florida in railway accident cases since 1887; and in Wisconsin they have been applying the rule to all types of negligence cases, apparently to the complete satisfaction of the Wisconsin bar, since 1931." Maloney, *From Contributory to Comparative Negligence: A Needed Law Reform,* 11 U Fla L Rev 135, 163 (1958).

Certainly, the juries which make up the panels in comparative negligence states are no more sagacious than the panels in those states following contributory negligence. Under conflict of laws rules, if an injury occurs in a state which does follow that concept, the jury would still apply comparative negligence, even if the matter were litigated in a contributory negligence state. We are not aware of any instance where the rules have had to be changed because the juries have not been able to handle it.

Further, there is sufficient case law derived from the experience under state and federal legislation and under common law to provide guidance in the decision-making process. Certainly, too, experience with the FELA and admiralty legislation, and with our own state's comparative negligence statute

cannot be dismissed with the mere conjecture that the process would suddenly be too confusing or too difficult to administer for the juries and courts of our state alone.

### (2) Will Comparative Negligence Discourage Settlement and Increase the Volume of Litigation?

Comparative negligence adherents have predicted more manageable court dockets because of fewer and shorter trials as plaintiffs no longer feel required to opt for jury trials in order to nullify the contributory negligence law, and defendants feel free to settle once the hope of winning via proof that plaintiff was contributorily negligent disappears. Since the remaining trials would be largely bench trials, the argument goes, trials will be shorter and more simplified.

Opponents, on the other hand, say that what has happened is that more plaintiffs receive awards under comparative negligence. See Brief for Amicus Curiae, Association of Defense Trial Counsel, *Parsonson v Construction Equipment Co, supra,* pp 12–14.[2] This, of course, is not the same thing as

---

[2] "Perhaps the only safe conclusion is that too many people and too many accidents are the causes of court congestion and doctrines of law will neither raise nor lower the fever." Brief for Amicus Curiae, Association of Defense Trial Counsel, *Parsonson v Construction Equipment Co, supra,* p 14. The amicus, after noting a study of the Arkansas experience which concluded that there was no drastic change in the court burden under two different comparative negligence statutes, and an editorial in the Milwaukee Journal complaining about the court docket (this was not restricted to the civil docket, nor was there any indication that there was a feeling that the negligence docket was greater than it would have been under contributory negligence) argued, "It is not the intention of this brief to enter this never-never land of assertion and counter-assertion for which reliable statistical verification is unavailable, but logic would indicate that more opportunity to collect for more people (under comparative negligence) would make for more claims." *Id,* pp 12–13.

*See also,* Brief for Amicus Curiae, Negligence Law Section of the State Bar of Michigan in Opposition to Comparative Negligence,

creating unworkable dockets or filing spurious claims.

Although the arguments concerning the burdens of judicial administration should not by themselves be reasons for changing or retaining legal systems, it is still useful to be able to anticipate future court problems. As best as we can surmise from the litigation and the arguments made to this Court,[3] neither party's theoretical arguments have tended to be true in practice.

While this says something about basing judgments on theoretical fears, it also indicates the importance of not making decisions based on threatened Pandora's Boxes or hoped-for Nirvanas.

A famous study of the operation of comparative negligence in Arkansas was undertaken by the Columbia University Project for Effective Justice. What the Arkansas study showed was:

(1) Under comparative negligence more persons who sustained tort injuries found lawyers ready to prosecute their damage claims. Rosenberg, *Comparative Negligence in Arkansas: A "Before and After" Survey,* 36 NY State Bar J 457, 466 (1964).

(2) More settlements were promoted under comparative negligence. Rosenberg, *supra,* 36 NYSBJ 467.

(3) There was no change in the tendency to demand a jury trial under comparative negligence. Rosenberg, *supra,* 36 NYSBJ 468.

---

*Parsonson v Construction Equipment Co, supra,* especially pp 10, 22. The amicus emphasized that, like the experience under FELA, comparative negligence would result in more plaintiffs receiving some award. Further, amicus paraphrased United States Supreme Court Justice Powell's observation (when he was an attorney) "if the contributory negligence rule is unfair to plaintiffs, the Mississippi rule of comparative negligence ["pure" comparative negligence] is equally unfair to defendants." *Id,* p 10.

[3] *See* Briefs for Amici Curiae, *Parsonson v Construction Equipment Co, supra.*

(4) Judges felt that liability was easier to assess but damages were difficult to ascertain. Lawyers agreed with the greater difficulty of assessing damages but felt that liability was also harder to determine. The report concluded that the evidence was that comparative negligence did not tend significantly to increase trial length, and that the greater difficulty of determining the damage issue was probably offset by greater ease in determining liability. Rosenberg, *supra,* 36 NYSBJ 468–469.

(5) Settlements during trial were unchanged. Rosenberg, *supra,* 36 NYSBJ 470.

(6) The size of plaintiffs' verdicts were apparently unchanged by the adoption of the comparative negligence statute. However, plaintiffs won the liability question more often than under contributory negligence. Rosenberg, *supra,* 36 NYSBJ 470. It is likely, then, that cases were worth more for settlement. Rosenberg, *supra,* 36 NYSBJ 473.

(7) The survey reported that whereas 63% of defense lawyers opposed comparative negligence at the outset, three years after adoption only 26% thought it was not helpful in before-trial settlements. Sixty percent of plaintiffs' lawyers found comparative negligence helpful, a decline of 10% from those who initially favored adoption. Rosenberg, *supra,* 36 NYSBJ 471–472.[4]

---

[4] A survey of Federal court statistics reported that comparative negligence did not affect jury demands or influence the length of trials, nor did it affect the ratio of suits that were filed and reached trial (as opposed to those settled before the point of filing). Rosenberg, *Comparative Negligence in Arkansas: A "Before and After" Survey,* 36 NY State Bar J 457, 473–474 (1964).

The findings of the Rosenberg study, originally published in 1959 were reconfirmed by a follow-up study: Note, *Comparative Negligence —A Survey of the Arkansas Experience,* 22 Ark L Rev 692 (1969). Brief for Amicus Curiae, Michigan Trial Lawyers Association in Support of Comparative Negligence, *Parsonson v Construction Equipment Co, supra.*

However, it should also be noted that a past president of the Wisconsin bar reported that under comparative negligence the num-

Since neither side has been able to show a disproportionate impact on trial dockets results from the adoption of comparative negligence, we do not hesitate to base our judgment largely on other matters.

### (3) Will Comparative Negligence Cause Insurance Rates to Increase?

Proponents report that the effect of comparative negligence on insurance rates has been minimal, with the suggestion that part of this is due to the tendency of insurance adjusters, juries,[5] and sometimes even courts to actually practice a form of comparative negligence even in contributory negligence states. Schwartz, Comparative Negligence (Treatise), § 21.1, p 338.

The Brief for Amicus Curiae, Association of Defense Trial Counsel, in the case of *Parsonson v Construction Equipment Co,* 386 Mich 61; 191 NW2d 465 (1971), maintains that the alleged fact of the jury's de facto repeal of contributory negligence is not necessarily a certainty, p 15. More significantly, however, one amicus refrained from making "a categorical statement that comparative negligence will mean increased insurance premiums, simply because there are too many variables". *Id,* p 15.[6]

ber of negligence cases tried "has been vastly decreased" and that the size of verdicts has not grown. Maloney, *supra,* 11 U Fla L Rev 163.

[5] "Even though the undisputed evidence shows that plaintiff's negligence did as a fact contribute to the injury the jury *may* find in favor of the plaintiff and this court cannot direct a new trial." *Layton v Rocha,* 90 Ariz 369, 370; 368 P2d 444, 445 (1962).

[6] The brief quoted, "It is possible that comparative negligence has an effect upon insurance rates, but that that effect cannot be detected with the data on hand and the techniques used." Peck, *Comparative Negligence and Automobile Liability Insurance,* 58 Mich L Rev 689, 728 (1960), quoted at p 15. The brief also reported that the ABA Special Committee on Automobile Accident Reparations concluded

Another amicus, Negligence Law Section of the State Bar of Michigan in Opposition to Comparative Negligence, *Parsonson v Construction Equipment Co,* predicted that adoption of the pure or modified form of comparative negligence would increase insurance rates, while application of the slight negligence rule might have little or no effect. Brief, p 24. That amicus appeared to rely on the opinion of several writers that comparative negligence increases the number of situations in which the plaintiff can recover, and that automobile liability insurance premiums in Wisconsin [with comparative negligence] were higher than in comparable communities in neighboring states. They also noted that insurance rates are already rising, and that it would be against the public interest to add comparative negligence and make costs concomitantly higher. *Id,* pp 25, 26, 29.

However, the Brief for Amicus Curiae, Michigan Trial Lawyers Association in Support of Comparative Negligence, reiterates the conclusion of Professor Peck, *Comparative Negligence and Automobile Liability Insurance,* 58 Mich L Rev 689, 728 (1960):

"It is possible that comparative negligence has an effect upon insurance rates, but that that effect cannot be detected with the data on hand and the techniques used. Even if this is true, however, some measure of its force has been obtained. Adoption of a comparative negligence rule, as shown by the Arkansas experience, would not have a catastrophic result upon the insurance rate structure of any state. Indeed, it would not have as much effect as rapid growth of population,

that if the Wisconsin modified form of comparative negligence is followed, "fewer cases will be denied any recovery, and the size of the award will be moderated. If it does not have a moderating effect, the result will be some increase in insurance costs", Brief for Amicus Curiae, Association of Defense Counsel, *Parsonson v Construction Equipment Co, supra,* p 16.

increased urbanization, or change to a traffic program
with the effective safety record of a neighboring state.
Its effect, if any, would probably go undetected in the
rates and statistics of the insurance industry."

Further, amicus quotes:

"[O]ne defense practitioner [who] has put the matter
more laconically: 'We pay more people perhaps, but we
pay less to each.' Pfankuch, *Comparative Negligence v
Contributory Negligence,* 1968 Insurance L J 725, 731
[1968]." Trial Lawyers Brief, *supra,* p 16.

One Amicus brief, that of the Negligence Law
Section of the State Bar of Michigan in Support of
Comparative Negligence, actually presented fig-
ures comparing insurance costs at the time be-
tween states having contributory negligence and
those with comparative negligence:

Quoting a defense attorney, amicus wrote:

"Let me give you the costs in various states having
contributory negligence:

| | |
|---|---|
| "Massachusetts—$129.92 | Illinois—$92.76 |
| New York—$109.69 | Connecticut—$91.32 |
| Rhode Island—$99.97 | New Jersey—$81.95 |

"Let us compare these costs with the comparative
negligence states:

| | |
|---|---|
| "Wisconsin—$75.74 | Georgia—$50.82 |
| Mississippi—$66.54 | Nebraska—$49.05 |
| Arkansas—$55.61 | South Dakota—$33.01 |

"All [the comparative negligence states] are below the
U.S. average of $79.64." Heft, *Comparative Negligence,*
19 Federation of Ins Counsel Q 91, 93 (Spring, 1969),
quoted in Negligence Section Brief, *supra,* pp 55–56, fn
98.

Amicus also quotes the observations of Pound:

"[K]eeping down insurance rates at the expense of

justice is not in keeping with humanitarian ideals of today. The world has been giving up the idea of leaving the burden of the nine million accidents which are recorded in the United States each year to fall wholly upon the injured victims." Pound, *Comparative Negligence,* 13 NACCA L J 195 (1954), quoted in Negligence Section Brief, *supra,* p 22.[7]

Here again, we find ourselves as we did when evaluating the question of increased litigation, with a situation in which the dire predictions appear not to have been realized, but where data to definitively resolve the issue are not fully conclusive.

### (4) Is Adoption of Comparative Negligence Unnecessary Since Juries Already Apply Some Form of Comparative Negligence?

This alleged predilection of juries has been adverted to as a factor in favor of *not* making a formal change to comparative negligence. Powell, *Contributory Negligence: A Necessary Check on the American Jury,* 43 ABA J 1005 (1957).

Some courts have also maintained the practice of jury administered comparative negligence exists.

"No one can appreciate more than we the hardship of depriving plaintiff of his verdict and of all right to collect damages from defendant; but the rule of contributory negligence, through no fault of ours, remains in our law * * * . It would be hard to imagine a case more illustrative of the truth that in operation the rule

---

[7] Advocates of comparative negligence also complain "that insurance counsel who make this argument [that rates increase] fail to produce statistics to support their claims, although they are in the best position to obtain statistics as to whether the facts bear out their claims." Maloney, *supra,* 11 U Fla L Rev 163.

of comparative negligence would serve justice more faithfully than that of contributory negligence. We but blind our eyes to obvious reality to the extent that we ignore the fact that in many cases juries apply it in spite of us." *Haeg v Sprague, Warner & Co, Inc,* 202 Minn 425, 429–430; 281 NW 261 (1938).[8]

"The doctrine of comparative negligence, or degrees of negligence, is not recognized by the Courts of Pennsylvania, but as a practical matter they are frequently taken into consideration by a jury. The net result, as every trial judge knows, is that in a large majority of negligence cases where the evidence of negligence is not clear, or where the question of contributory negligence is not free from doubt, the jury brings in a compromise verdict." *Karcesky v Laria,* 382 Pa 227, 234; 114 A2d 150, 154 (1955).[9]

However, it is apparent that often a jury, as in the case at bar, does not so compromise and instead follows the court's instructions as they are supposed to do. This may then result in at best a rough-hewn type of justice, one in which, if the jury chooses to in effect disobey the law, the "lucky" plaintiff may receive a form of justice, but where a jury chooses instead to follow the law an even more deserving plaintiff would be barred from recovery.

Even if the jury does adopt the compromise verdict,

---

[8] The court there felt compelled to apply contributory negligence in the absence of legislative change of the contributory negligence doctrine.

[9] This proclivity of the jury has apparently been substantiated by several studies. *See, e.g.,* Kalven, *Report on the Jury Project, Conference on Aims and Methods of Legal Research,* 28, 30, 31 (U Mich Law School, 1955), cited in Maloney, *From Contributory to Comparative Negligence: A Needed Law Reform,* 11 U Fla L Rev 135, 144 (1958). Further, "[t]o the extent that other rules of law are relaxed to allow more cases to reach the jury, the chances of sub rosa apportioning of fault among all those responsible, rather than placing the entire burden on a contributorily negligent plaintiff, are likewise increased". 11 U Fla L Rev 145.

"[I]t has been pointed out that the practice itself is evidence that the contributory negligence rule does not conform to the community's sense of justice—indeed, it fosters disrespect for the law by perpetuating a questionable system whereby trial judges instruct juries on the theory of contributory negligence while tacitly recognizing that the jury will disregard the instructions and somehow apportion the damages." Anno, *supra,* 32 ALR3d 488.

"[T]he disrespect for law engendered by putting our citizens in a position in which they feel it is necessary to deliberately violate the law is not something to be lightly brushed aside; and it comes ill from the mouths of lawyers, who as officers of the courts have sworn to uphold the law, to defend the present system by arguing that it works because jurors can be trusted to disregard that very law." Maloney, *From Contributory to Comparative Negligence: A Needed Law Reform,* 11 U Fla L Rev 135, 151–152 (1958).[10]

Therefore, we believe this argument is persuasive only to convince us that, if it is indeed true that juries do apply comparative negligence sub rosa, it would be better to bring the practice out from underneath the table.

### (5) Does No-Fault Legislation Make Comparative Negligence Unnecessary?[11]

One of the most telling arguments in support of comparative negligence is that because it allocates liability according to fault, it is more faithful to the fault principle underlying our negligence law than the aberrational contributory negligence concept. Logically, then, the adoption of no-fault legis-

---

[10] And what about those cases tried by a judge, or where the court, as a matter of law, finds plaintiff was contributorily negligent?

[11] This was discussed in oral argument before our Court in the instant case.

lation may well reduce the need for a comparative negligence approach.

The argument, however, is too simplistic, for, while no-fault would apply to most automobile negligence cases, it does not apply to all, as there is still a considerable area of no-fault exceptions in which the fault principle is still applied.[12] Further, no-fault is indeed at the present time restricted to only automotive litigation, and, for example, cases involving slip and fall, products liability, or plane, boat, or train accidents are not affected.

It is also coincident with the policy expressed in no-fault, that victims of automobile accidents may be compensated *regardless* of whether they are at fault, to do away with a rule that "bars *any* recovery because of *some fault". Codling v Paglia,* 32 NY2d 330, 345, 346; 298 NE2d 622, 630, 631 (1973) (Jasen, J., concurring).

Thus, other states have not found the doctrines mutually exclusive. "Of the 21 states having

---

[12] *E.g.,* MCLA 500.3135; MSA 24.13135 provides:

"(1) A person remains subject to tort liability for noneconomic loss caused by his ownership, maintenance or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function or permanent serious disfigurement.

"(2) Notwithstanding any other provision of law, tort liability arising from the ownership, maintenance or use within this state of a motor vehicle with respect to which the security required by subsections (3) and (4) of section 3101 was in effect is abolished except as to:

"(a) Intentionally caused harm to persons or property. Even though a person knows that harm to persons or property is substantially certain to be caused by his act or omission, he does not cause or suffer such harm intentionally if he acts or refrains from acting for the purpose of averting injury to any person, including himself, or for the purpose of averting damage to tangible property.

"(b) Damages for noneconomic loss as provided and limited in subsection (1).

"(c) Damages for allowable expenses, work loss and survivor's loss as defined in sections 3107 to 3110 in excess of the daily, monthly and 3 year limitations contained in those sections. The party liable for damages is entitled to an exemption reducing his liability by the amount of taxes that would have been payable on account of income the injured person would have received if he had not been injured."

adopted comparative negligence since 1969 by stat-
ute * * * , 13 also have no-fault coverage * * * .
Among the six earlier adherents two have since
adopted no-fault plans." Fleming, *Foreword: Com-
parative Negligence at Last—By Judicial Choice,*
*supra,* 64 Cal L Rev 239, 240, fn 3 (1976). Georgia
and Florida, which adopted comparative negli-
gence by court decision, also have no-fault plans.
Schwartz, Treatise, § 1.4, p 12; § 1.5, pp 18–19, 24–
27.

Thus, the adoption of no-fault, if it affects com-
parative negligence at all, affects only the scope of
the change. If anything, therefore, it makes the
new doctrine less revolutionary than it otherwise
might be. But it does not eliminate the need for
the change.

Fitzgerald, J. *(concurring in part).* We concur
in Part III of Justice Williams' opinion. The jury
instructions were erroneous and confusing. The
trial court also erred by ordering the jury to begin
deliberating before counsel could object to the
instructions. GCR 1963, 516.2.

However, we do not believe this case is an
appropriate vehicle for adopting a theory of com-
parative negligence. The parties have not had an
opportunity to brief or discuss the issue. They did
not raise it in the Court of Appeals or this Court.
At oral argument, both parties were reluctant to
use this case to discuss comparative negligence.
We should not inject into a case a theory which
the parties are unwilling or have not had an
opportunity to discuss.

The proposed adoption of comparative negli-
gence raises problems which transcend this case.
At oral argument, plaintiffs' counsel wondered
"with the advent of no-fault legislation, whether or

not comparative negligence should be adopted at all". He also wondered "whether or not it should be something that the Legislature does as distinguished from our Courts".

If the Court accepts the burden of altering a fundamental theory of tort law, we should do so in a carefully informed manner. It does not suffice to say that the issue was briefed in *Parsonson v Construction Equipment Co,* 386 Mich 61; 191 NW2d 465 (1971). That case was argued May 6, 1971. Only two members of the present Court heard the argument. Although briefs on comparative negligence were requested, that Court did not take a stand on whether it should be adopted.

Comparative negligence is a complex and difficult doctrine. It should not be considered without a proper presentation. Six years have passed since *Parsonson* was argued. Theories popular then may have been discredited. New. and better theories may have arisen. Experience may have shown that certain versions of the comparative negligence theory are better than others. Indeed, experience may have shown that comparative negligence is not a good tort theory. We do not know from the presentation in this case. We do not have the information we need. This is a major step which should be taken hand-in-hand with the bar. It should not be imposed without an opportunity for full discussion.

Reversed and remanded for new trial.

COLEMAN and RYAN, JJ., concurred with FITZGERALD, J.

BLAIR MOODY, JR., J., took no part in the decision of this case.